# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**In re: Application for a Search Warrant
for the premises of:**

**** WAHLER PLACE, SE, WASHINGTON, DC

**** STANTON ROAD SE, APARTMENT #***, WASHINGTON, DC

**** FOURTH STREET, SE, APARTMENT #*, WASHINGTON, DC

**** FOURTH STREET, SE, APARTMENT #*, WASHINGTON, DC

**** FOURTH STREET, SE APARTMENT #*, WASHINGTON, DC

**** FOURTH STREET, SE, APARTMENT #*, WASHINGTON, DC

**** FOURTH STREET, S.E., APARTMENT #***, WASHINGTON, D.C.

**** SECOND STREET, S.E., APARTMENT *, WASHINGTON, D.C.


I, **Christopher Fiorito,** Special Agent (SA) with the Federal Bureau of Investigation (FBI), Washington Field Office (WFO), Washington, D.C. (hereinafter affiant), being duly sworn, depose and state as follows:

## I.    BACKGROUND AND EXPERIENCE

1.    I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code (USC), Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 USC § 2516.

2.    I have been a SA since 2002 and I have received training and experience in

1

interviewing and interrogation techniques, arrest procedures, search and seizure, homicide, gang, organized crime, drug and money laundering investigations, including the illegal structuring of financial transactions, surveillance techniques, asset forfeiture, unlawful importation, possession with intent to distribute and distribution of controlled substances; engaging in financial transactions to promote, disguise or conceal illegal drug trafficking and the source of the proceeds derived from it, and unlawfully engaging in monetary transactions involving the proceeds of specified unlawful activity, practices commonly referred to collectively as "money laundering;" and conspiracies associated with the foregoing criminal offenses which are prohibited by 21 USC §§ 841(a)(1), 843(b), and 846,  and 18 USC §§ 922(g), 924(c), 1956 and 1957.

3.     Your affiant is presently assigned to the Safe Streets Task Force in the Washington Field Office of the FBI in Washington, D.C.  This particular Task Force investigates violent street gangs and crews in Washington, D.C. in which most of the members are involved in the distribution of narcotics.  Your affiant has been assigned to investigations involving the illegal possession, distribution, and/or manufacturing of controlled substances and has personally participated in the execution of numerous search and arrest warrants involving narcotics-related offenses.  During your affiant's tenure as a law enforcement officer, he has also interviewed and debriefed a number of individuals directly involved in the distribution of illicit drugs, including defendants, informants, cooperating witnesses, and others with personal knowledge of and experience in the purchase and sale of illicit drugs and the amassing, conversion, concealment, and disposition of the proceeds derived from such activity.  Your affiant has also participated directly in drug investigations utilizing court-authorized electronic surveillance, including wire interceptions.

4.     Through instruction and participation in investigations, your affiant has become

2

familiar with the manner in which narcotics traffickers conduct their illegal business and the methods, language, and terms which are used to disguise conversations about their narcotics activities. From experience and training, your affiant has learned, among other things, drug traffickers virtually never expressly refer to crack cocaine, powder cocaine, or other drugs by name, instead, to conceal the true nature of their illegal activities and to thwart detection by law enforcement, they refer to the drugs and drug quantities using seemingly innocent terms, that narcotics traffickers keep narcotics, narcotics related items and paraphernalia, money, firearms, and firearm related items in their residences, and/or their vehicles, and/or stash/storage locations, such as other apartments, garages, sheds and storage lockers. In addition, narcotics traffickers package their narcotics for sale in varying quantities. Ziploc baggies, small and large, are the packaging material of choice. Scales are often used to ensure the quantities are commensurate with price, as well as used to determine as accurately as possible, the varying amounts of the drugs being sold. Microwave ovens, pots, dishes, false bottom containers and other containers, cooking utensils, and cutting agents are also found in these locations, as they are often used to cook powder cocaine into crack cocaine. lt is also common for narcotics traffickers to distribute from a specific location, to include stash houses, the residences of family members and associates, both witting and sometimes unwitting, and locations where other trusted associates of the trafficker are allowed access to, in order to protect the cache of drugs as well as the drug proceeds derived from the sale of these drugs. Such locations provide security for the trafficker, and it is a known location where customers go to obtain drugs. Further, your affiant knows from training and experience, that drug traffickers often use and retain firearms, and other weapons, to protect themselves, as well as to secure their cache of narcotics.

5.      Additionally, narcotics traffickers keep records of their trafficking activities to ensure they receive payment for the narcotics their customers purchase. These records may be in written or electronic form. It is also common for narcotics traffickers to utilize multiple cellular telephones and pagers to facilitate communications, while concealing their true location, between themselves, their associates, their suppliers, their associates, customers and workers. In your affiant's training and experience, it is common for narcotics traffickers to utilize these telephones to ensue mobility, their relative security and their belief that law enforcement has difficulty intercepting the communications to and from these phones.  Narcotics traffickers often maintain books, records, receipts, notes, ledgers, money orders, bank records, money, safety deposit boxes and keys, telephone numbers, address books, numerous business cards, photographs, and other documentation relating to the transportation, ordering, sale and distribution of controlled substances. Your affiant is also aware that these items are generally maintained and retained in the drug trafficker's residence or the residence of a relative or associate where the drug dealer can quickly and easily access them and/or in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated. Additionally, it is a common practice for drug dealers to utilize safes within their residences, or the residence of a confidante, relative or associate, in an effort to safeguard and  more importantly,  conceal the  proceeds of their drug trafficking. It is also your affiant's experience that the individuals who posses and store firearms in their residences, vehicles and/or stash locations, often store ammunition, shell casings, slugs, targets, holsters, gun cleaning kits and ownership papers.

6.      Through experience, your affiant knows that individuals involved in narcotics trafficking conceal within their residence, the residences of family members, friends and associates,

4

in the places of operation of the drug distribution activity, such as a stash house or safe house, or in a business location with which the trafficker is associated, large amounts of currency, financial instruments, precious metals, jewelry and other items of value, and or proceeds of financial transactions relating to obtaining, transferring, secreting or spending large sums of money made from engaging in narcotics trafficking within their residences, offices and businesses, garages, storage buildings, automobiles, and safety deposit boxes.

7.     Based upon your affiant's knowledge, training, and experience, and participation in numerous other investigations involving cocaine base, powder cocaine and other controlled dangerous substances, your affiant also knows that:

(a).     Individuals who deal in the sale and distribution of controlled substances commonly maintain addresses and telephone number books or papers which reflect names, addresses and/or telephone numbers for their associates in their illegal organization. These individuals often utilize cellular telephones, pagers and telephone systems to maintain contact with their associates in their illegal businesses. These telephone records, bills and pager numbers are often found in their place of residence, or the residence of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

(b).     Individuals who deal in illegal controlled substances often take photos of themselves, their associates, their property and illegal contraband. These photos are usually maintained in their place of residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

(c).     Persons who traffic controlled substances maintain documents, letters and records

5

relating to illegal activity for long periods of time. This documentary evidence is usually secreted in their residence, or the residences of family members, friends or associates, in their businesses, or in the places of operation of the drug distribution activity, such as a stash house or safe house. This documentary evidence includes but is not limited to telephone numbers, telephone books, address books, credit card and hotel receipts, plane and bus tickets and receipts, car rental receipts, accounts and records in fictitious names, false identification, money orders, cashiers checks relating to cash transactions and records indicating the existence of storage facilities used in narcotics trafficking.

(d). Individuals involved in narcotics trafficking often own, possess and/or use weapons as a means to facilitate their illegal drug activities. Such weapons are most often secreted in their residence, or the residences of family members, friends or associates, in their business locations, or in the places of operation of the drug distribution activity, such as a stash house or safe house.

(e) that it is common to maintain and store the aforementioned evidence of narcotics trafficking crimes on electronic storage devices, including computers, mobile or cellular telephones, pagers, personal digitial assistants (PDAs), handheld computers, MP3 players, digital hard drives, including, but not limited to IPODS and external storage drives; and the media to store information, including diskettes, tapes or data storage devices.

8. In the course of conducting these investigations, your affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses; conducting physical surveillance; conducting short-term and long-term undercover operations, including reverse undercover drug operations and controlled deliveries; consensual monitoring and recording of both telephonic and non--telephonic communications; analyzing telephone pen registers and caller identification system data; conducting court-authorized electronic surveillance; and

6

preparing and executing search warrants which have led to substantial seizures of narcotics, firearms and other contraband. As part of my current assignment, I have been investigating the narcotics organization discussed herein, a violent street crew which controls several blocks in Southeast Washington, D.C.   This criminal organization is headed by JAMES LAMONT BECTON and his brother, WILLIE LATRELL BEST,  and controls a small but significant area of southeast D.C., specifically including, but not limited to the 4200 and 4300 blocks of Fourth Street, SE.

9.    Information provided in this affidavit is based upon the affiant's personal knowledge and/or information obtained from other law enforcement personnel, confidential sources and databases containing intelligence.

## II.    RELEVANT CRIMINAL HISTORIES

10.    During the course of this investigation, the following individuals, among others, have been identified as being involved in a conspiracy to distribute and possess with intent to distribute crack cocaine, powder cocaine and ecstacy: **James Becton, Willie Best, Frederick Mercer, Carolyn Becton, Shannon Best, Jaquan Best and Russell Ramseur.**

11.    The following criminal histories have been obtained for these persons:

(a) JAMES LAMONT BECTON, a/k/a Pumpkin, is a black male born on March **, 19**, with a Social Security Number of ***-**-****.   He has the following criminal history (FBI#*********):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 03-25-1992 | Possession of a Prohibited Weapon, Class A, Etc | Washington, DC | Disposition Unknown |
| 04-03-1992 | Uniform Controlled Substance Act | Washington, DC | Disposition Unknown |

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 04-17-1993 | Assault with a Dangerous Weapon-Criss- Cross | Washington, DC | Disposition Unknown |
| 01-30-1995 | Murder I While Armed; Murder II, Manslaughter; PFCV; CPWL | Washington, DC | 06-09-1997 Counts 1-4, Not Guilty; Count 5 40-120 months |
| 06-05-1995 | 01-27 616 Murder; 02-27-616 Murder; 03-27 489 Robbery w/Dang & Dead; 04-27 29 Burglary Generally; 05-27 30 Burglary INT/STEAL/NI; 06-27 36B Handgun Wear/Carry; 08-27 7348A Car jacking; 09-27 286 CDS Unlawful Mfrg ETC | Baltimore Co PD | 03-09-1998 Not Guilty Counts 1-4, 6&7, Nolle Prosequi Counts 5,8&9 |
| 11-16-1995 | Murder I While Armed | Washington, DC | 06-03-1996 Dismissed/With Prejudice |
| 08-19-1999 | CPWL | Washington, DC | 30-90 months |
| 04-25-2001 | UCSA PWID Cocaine | Washington, DC | Dismissed |
| 06-17-2003 | UCSA PWID Cocaine | Washington, DC | 2 Years, 3 years suspended |

(b) WILLIE LATRELL BEST is a black male born on July **, ****, with a Social Security Number of ***-**-****. BEST, a leader of this narcotics organization, has been identified as a

significant supplier of cocaine base, also known as crack cocaine, in the District of Columbia, which

he is redistributing with the assistance of co-conspirators in the District of Columbia. The following

criminal history was located for BEST (FBI #*********):

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 10-04-1994 | Assault with a Dangerous Weapon Gun; CPWL; UF; UA | Washington, DC | 03-14-1995, 6 years; 3 years Youth Rehabilitation Act |
| 01-13-1995 | Felony Bench Warrant; Bail Reform Act; UCSA PWID Cocaine | Washington, DC | 1-13-1995 Guilty Possession of Cocaine, 5 Years |
| 11-15-1995 | Murder I While Armed | Washington, DC | Disposition Unknown |
| 12-19-1995 | Failure to Appear | USM Akron, OH | Disposition Unknown |
| 09-02-1998 | UCSA Possession of Marijuana | Washington, DC | 09-03-1998 No Paper |
| 03-02-1999 | UCSA PWID Cocaine-Crack USCA PWID Marijuana | Washington, DC | 05-03-1999 DWP |
| 07-04-1999 | Receiving Stolen Property | Washington, DC | Disposition Unknown |
| 08-12-2003 | False Statements to Officer | Edmonston PD, MD | 10-03-2003 Failure to Appear |
| 08-29-2003 | CPWL; Unregistered Ammo | Washington, DC | Disposition Unknown |
| 01-15-2004 | PWID - Cocaine | Washington, DC | No papered |
| 08-18-2004 | USCA Distribution of Cocaine | Washington, DC | Disposition Unknown |

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 12-20-2004 | Assault & Battery - Family Member | Alexandria, VA | 02/07/2005 Guilty; Misdemeanor 10 days suspended |
| 10-14-2004 | Conspiracy to Traffic in Cocaine; Two counts in Trafficking in Cocaine | Smithfield, NC | 11/5/2004 Dismissal without Leave |

(c) FREDERICK HAROLD MERCER, a/k/a Fred, is a black male born on March **, 19**, with a Social Security Number of ***-**-****. MERCER has been identified as a significant distributor of cocaine base, also known as crack cocaine, in the District of Columbia, which he is redistributing with the assistance of co-conspirators. MERCER is a known member of the narcotics conspiracy discussed herein, and claims to be a cousin of the leaders of the enterprise, BEST, and his brother, BECTON. MERCER is believed to reside in an apartment at ****-* Haras place, Apartment *, Fort Washington, Maryland.  The following criminal history was located for MERCER (FBI# *********):

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 06-07-1992 | AWIR/ Destruction of Property | Washington, DC | Dismissed 07-07-1992 |
| 08-02-1992 | Simple Assault | Washington, DC | DWP 03-17-1993 |
| 12-02-1993 | Unauthorized Use of Vehicle | Washington, DC | No papered |
| 11-19-1993 | Burglary/Theft Less than $300 | Prince George's County, MD | Nolle prosequi |
| 09-24-1994 | Felony Possession of Cocaine | Clinton, NC | Dismissal w/o leave |

| Date of Arrest | Charge | Location | Disposition |
|---|---|---|---|
| 02-11-1995 | Armed Robbery Gun | Washington, DC | 5-15 years adult incarceration |
| 06-06-2001 | Armed Robbery | FCI-Edgefield | Unknown |
| 05-13-2003 | PWID-Cocaine | Washington, DC | No papered |
| 10-23-2003 | Violation/ Drugs | Rivers FCI | Unknown |

(d) CAROLYN ROMAINE BECTON MOODY is a black female born on February **, 19**, with a Social Security Number of ***-**-****. She has the following criminal history (FBI#*********):

| Date of Arrest | Charges | Location | Disposition |
|---|---|---|---|
| 07-07-1985 | Petty Theft | Prince George's County, MD | 02-18-1986 Guilty, sentence - 1 day |
| 03-21-1993 | Simple Assault; Assault with a Dangerous Weapon-Bottle | Washington, DC | Disposition Unknown |

(e) SHANNON MARIE BEST, a/k/a Big Face, is described as a black female born on February **, ****, with a Social Security Number of ***-**-****. She has no criminal history and no FBI number.

(f) JAQUAN BEST, a/k/a Wop, is described as a black male born on January **, 19**, with the Social Security Number of ***-**-**** and ***-**-**** used. He has the following criminal history (FBI# *********):

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 08-22-2002 | Tresspass/FTA | Prince George's County, MD | Unknown |
| 10-10-2002 | Theft >$500 | Prince George's County, MD | Nolle Prossed |
| 12-02-2003 | PWID/While Armed Carrying a gun | Prince George's County, MD | Guilty of PWID While Armed/other charges Nolle Prossed |
| 01-25-2006 | False Statements | Prince George's County, MD | Pending |

(g) RUSSELL LYNE RAMSEUR, Jr., a/k/a Squirt, is described as a black male born on June **, 19**, with a Social Security Number of ***-**-****. He has the following criminal history (FBI# *********):

| Date of Arrest | Charges | Location | Disposition |
| --- | --- | --- | --- |
| 06-20-1994 | Robbery While Armed/PWID-Cocaine | Washington, DC | Disposition Unknown |
| 06-26-1995 | PWID - Cocaine | Washington, DC | Guilty Plea; 1Y probation/ drug testing |
| 10-30-1995 | ADW- Shod Foot | Washington, DC | Nolle Prosequi |
| 12-18-1995 | Fugitive from Justice | Washington, DC | Disposition Unknown |
| 12-20-1995 | Robbery/DW | Upper Marlboro, MD | Disposition Unknown |
| 06-18-1996 | Robbery/DW | Washington, DC | Disposition Unknown |
| 12-14-1999 | Armed Robbery | Washington, DC | 5 Years/ESS 2 Years/3Years probation |

| 12-31-2003 | Violation of Parole/Armed Robbery | Baltimore, MD | Sentenced to do remainder of sentence |
|---|---|---|---|

## III.    LONG TERM NARCOTICS CONSPIRACY

12.    Your affiant's investigation revealed that JAMES BECTON, WILLIE BEST, FREDERICK MERCER, and SHANNON BEST, and others have engaged in a long-term conspiracy, and are continuing to engage in an on-going conspiracy, to distribute and possess with the intent to distribute cocaine base (also known as crack), cocaine, and other controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846), use, carry, and possess firearms in furtherance of drug trafficking offenses, in violation of 18 U.S.C. § 924(c), and commit money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.  This conclusion is derived from various sources of intelligence, to include confidential sources, controlled purchases of illegal narcotics, and intercepted communications obtained during judicially authorized wiretaps.

### A.    **CONFIDENTIAL SOURCE INFORMATION**

#### 1.    Confidential Source Number One

13.    Confidential Source Number One (hereinafter referred to as "S-1") began cooperating with the FBI In January of 2005.  S-1 also has an extensive criminal history and is working with the government pursuant to a cooperation agreement.  S-1 has not been paid for the assistance it has provided in connection with this investigation and S-1 is not presently incarcerated.

14.    S-1 has provided reliable information concerning JAMES BECTON, WILLIE BEST, FREDERICK MERCER, and other members of this narcotics enterprise, as well as other significant narcotics traffickers in the southeast quadrant of the District of Columbia.  S-1's information has

13

been corroborated by other sources of information, evidence gathered during this investigation, and other investigations conducted by the FBI. S-1 has never been known to provide false information.

15.      According to S-1, S-1 has had a personal relationship with WILLIE BEST, JAMES BECTON, and FREDERICK MERCER, and has known them for many years. Moreover, BECTON and BEST are brothers, they are long-time drug traffickers, and they are the main suppliers of crack cocaine to various co-conspirators within their drug network. S-1 stated that it began purchasing drugs from BEST and his crew in the late 1990s, and S-1 purchased as much as kilogram (1000 gram) quantities of cocaine from BEST, most recently in 2005.

16.      S-1 identified MERCER, BECTON, and others as being involved in drug trafficking with BEST. S-1 knows that MERCER sells cocaine for BEST and BECTON in several courts located in the 4200 and 4300 blocks of Fourth Street, SE, Washington, D.C. S-1 has seen MERCER sell drugs out of his vehicle and during hand-to-hand transaction and on at least one occasion in 2005, S-1 purchased approximately 66 grams of powder cocaine from MERCER in Washington, D.C. metropolitan area. S-1 also observed MERCER in possession of a significant amount of powder cocaine into crack cocaine in 2005.

17.      S-1 stated that BEST and BECTON are very close, with BEST preferring to maintain low profile and BECTON being more "flashy" and getting the latest in cars, clothes and entertainment. S-1 knows that BECTON oversees the drug sales which occur in the 4200 and the 4300 blocks of Fourth Street, SE, D.C. S-1 knows that for a time, BECTON was storing drugs at 4219 Fourth Street, SE, Apartment #7.  This apartment was the residence of one of BECTON's baby's mothers.

18.      S-1 knows that in 2004 BEST got arrested in North Carolina for a controlled

14

substance violation with a female and one of BEST's cousins.  According to S-1, once BEST returned to the D.C. area, he told S-1 that he was not going to be making the trips for drugs any more and that he did not trust anyone after this incident.  Your affiant confirmed that in October of 2004, BEST and two individuals were stopped by the North Carolina State Highway Patrol in Johnson County, North Carolina. BEST and another person were stopped in one vehicle and a third person was stopped driving a rental vehicle.  Pursuant to the traffic stop of both vehicles, a canine search of the vehicle driven by third person yielded four kilograms of cocaine and documents in the name of BEST were found in the rental car driven by the third party.  All three suspects were arrested in North Carolina at that time and charges against BEST and the companion in his car were ultimately dismissed.

19.    Also according to S-1, BEST, BECTON, and MERCER have based their drug operation in the 4200 and 4300 blocks of Fourth Street, SE, D.C., and just north of the Maryland State line from 1998 to 2005.  This area, the 4200 block of Fourth Street, SE, is referred to by BEST and his crew members as the "pit" or the "hole" and S-1 has personally seen BECTON in the second court of the 4200 block of Fourth Street, SE, selling drugs, meeting with associates to discuss drug business, dropping off drugs for sale, and collecting drug proceeds.

2.    Confidential Source Number Two

20.    Confidential Source Number 2 (hereinafter referred to as "S-2") began providing information to the FBI concerning narcotics trafficking, firearms, and acts of violence in August of 2003.  S-2 is presently incarcerated and has an extensive criminal history.  S-2 is also working with the government pursuant to a cooperation agreement.

21.    S-2 has provided reliable information concerning criminal activity which has been corroborated by the FBI and other sources of information during the investigation. S-2 has also provided reliable information concerning crimes other than narcotics offenses, including, but not limited to, murders, shootings and other offenses, and S-2 has never been known to provide false information.

22.    According to S-2, it has known BEST, BECTON and MERCER for over five years and has personally witnessed them and their associates sell crack cocaine on Fourth Street, SE, D.C. Moreover, S-2 has known BEST, BECTON, MERCER, and their associates, to include RUSSELL RAMSEUR, to have worked together to redistribute large quantities of cocaine, crack cocaine and/or marijuana in and around the southeast quadrant of Washington, DC. According to S-2, BEST's organization is responsible for selling illegal drugs primarily in the 4200 and 4300 blocks of Fourth Street, SE, D.C., and BEST, BECTON, MERCER, and their organization are violent and have ready access to a variety of firearms.

23.    S-2 is aware of a number of violent acts BECTON has committed on behalf of BEST. S-2 is also aware that BEST relies on BECTON for enforcement within their drug trafficking organization and S-2 knows that MERCER is a distributor for this narcotics enterprise. Moreover, S-2 has witnessed BECTON deliver drugs to buyers on behalf of BEST, pick up money owed to BEST, and sell drugs hand-to-hand for long periods of time, to include a time period between 1998 and 2003. Also, S-2 purchased drugs (crack) from JAMES BECTON between 2000 and 2003, and on at least one occasion S-2 purchased drugs from BEST in 2003. S-2 has also overheard BECTON instructing another co-conspirator named KEITH SAMPLER, also known as "Son" and "Son-Son," to retaliate against rival drug dealers.

16

3.     Confidential Source Number Three

24.     Confidential Source Number Three (hereinafter referred as "S-3") began providing information to the FBI in December of 2004.  S-3 is presently incarcerated and has an extensive criminal history.  S-3 is also working with the Government pursuant to a cooperation agreement and has not been paid for assistance it has provided.

25.     S-3 has assisted the FBI and other law enforcement agencies in several drug investigations, this information has been corroborated by other sources of information and evidence, and S-3 has never been known to provide false information.

26.     According to S-3, it has known WILLIE BEST and BECTON for over 10 years. BEST and BECTON have been supplying crack cocaine in the southeast quadrant of the District of Columbia for a long period of time, MERCER is a member of their criminal organization and works for BEST, and BEST controls the drug trade on Fourth Street, SE, D.C.

27.     S-3 states that BEST transported multiple kilogram quantities of cocaine from North Carolina in 2004 and S-3 also knows that in October 2004 BEST and others were arrested in North Carolina after four kilograms of cocaine were found by the police during a traffic stop.  Moreover, in 2004,  S-3 overheard BEST discussing purchasing firearms and bringing them into the District of Columbia.

4.     Confidential Source Number Four

28.     Confidential Source Number Four (hereinafter referred to as "S-4") began cooperating with the FBI in March of 2005.  S-4 has an extensive criminal history and is presently incarcerated; however, there are no pending charges against S-4 and S-4 cooperating with the government in exchange for consideration of a potential reduced jail sentence in the future.

17

29.     S-4 has assisted the FBI and other law enforcement agencies in several criminal investigations and S-4 has not been paid for the assistance it has provided.  Intelligence or information provided by S-4 has been corroborated by other sources of information and evidence, and S-4 has never been known to provide false information.

30.     S-4 has known JAMES BECTON and WILLIE BEST since the late 1990s and during that same time period S-4 began purchasing eight-ball quantities (3.5 gams) of crack cocaine from BEST.  S-4 then increased to purchasing ounce quantities (28 grams) of crack cocaine from in late 1990s.  BEST ultimately gave S-4 advice on how to increase S-4's profit margin in the drug trade and at one point S-4 purchased thirty-one gram quantities of crack cocaine from BEST twice a week in the late 1990s.  From January 2002 until July 2002, S-4 also purchased crack cocaine from BEST.

31.     According to S-4, BEST recruited S-4 to sell illegal drugs on Fourth Street, SE, D.C., and S-4 was making so much money from selling the drugs it got from BEST that it would meet BEST several times a week to "re-up" (get more drugs).  Furthermore, BEST told S-4 at one  point that S-4 needed to consider drug trafficking as a career.

32.     S-4 also sold guns to BEST on a number of occasions and received crack cocaine from BEST as payment for the firearms.   In July 2002 S-4 also obtained guns from BEST on Fourth Street, SE, D.C.

B.     **CONTROLLED PURCHASES OF NARCOTICS**

33.     In addition to intelligence derived from Confidential Informants, the affiant's investigation incorporated several undercover or clandestine purchases of illegal narcotics from the BEST-BECTON drug organization which demonstrates its involvement in drug trafficking.  More specifically, undercover purchases were derived from Confidential Source Number Five (hereinafter

18

referred to as "S-5") and Confidential Source Number Six (hereinafter referred to as "S-6"). S-5 began cooperating with the FBI in November of 1996. S-5 is presently incarcerated and has an extensive criminal history; however, there are no charges pending against S-5 and S-5 is working with the Government in exchange for consideration of a reduction in sentence. S-5 has assisted the FBI and other law enforcement agencies in several criminal investigations and S-5 has never been known to provide false information.

34.     On May 1, 2001, S-5 went to 4219 Fourth Street, SE, Apartment #7, and was told by a female believed to be JAMES BECTON's girlfriend that BECTON had just left but he would be returning shortly. A short time later, BECTON returned and told S-5 to wait in the parking lot while he went into 4219 Fourth Street, SE. A short time later, BEST entered the parking lot and asked S-5 if S-5 was waiting for his brother. S-5 replied yes, and BEST told S-5 to come with him. S-5 and BEST then entered 4219 Fourth Street, SE, and found BECTON in the hallway. At that point, BECTON told S-5 the cocaine he was selling was "butter," meaning high quality cocaine. Thereafter, S-5 gave BECTON $1200.00 in prerecorded funds in exchange for eight small blue plastic zip lock bags in the presence of BEST. After the transaction, S-5 gave the drugs to law enforcement officials. The bags and their contents, which weighed approximately 30 grams, field-tested positive for cocaine and were confirmed as cocaine through DEA Laboratory analysis. The conversation between S-5, BEST and BECTON was recorded.

35.     On June 18, 2001, S-5 contacted BEST and asked to purchase one ounce of crack cocaine. Thereafter, BEST told S-5 he would be delayed in getting to Fourth Street, SE, because he (BEST) had to pick up his children first. A short time later, BEST drove into the parking lot near 4217 Fourth Street, SE, D.C.. He later gave S-5 a plastic bag containing a single chunk of an off-

white rock-like substance and S-5 gave him $1200.00. After the transaction, S-5 gave the drugs to law enforcement officials. The contents and the bag, which weighed approximately 28.3 grams, field-tested positive for cocaine and was later confirmed as cocaine through DEA Laboratory analysis. The conversation between S-5 and BEST was recorded.

36.     S-6 began cooperating with the FBI in April of 2002. Moreover, S-6 has an extensive criminal history, is awaiting sentencing on drug charges, and is working with the Government in exchange for potentially receiving a more lenient sentence. S-6 has assisted the FBI and other law enforcement agencies in several criminal investigations and S-6 has never been known to provide false information.

37.     On June 6, 2002, S-6 made a controlled purchase of crack cocaine from BEST. While in route to meet BEST, S-6 received a call from BEST, who stated he was in the 4100 block of Fourth Street, SE. S-6 arrived at that location in the District of Columbia and BEST got into S-6's car. Soon thereafter, S-6 gave BEST $1500.00 of pre-recorded funds and BEST gave S-6 a plastic sandwich bag with what appeared to be crack cocaine inside. S-6 ultimately gave the crack to the FBI. The contents of the bag weighed approximately 29.1 grams, field-tested positive for cocaine, and was later confirmed as cocaine through DEA Laboratory analysis. The conversation between S-6 and BEST was recorded.

38.     On June 19, 2002, S-6 drove into the parking lot of the pit, an area located on Fourth Street, SE, D.C. During that time period, S-6 observed BEST, BECTON and several of their associates. S-6 eventually approached BEST then BEST, S-6, and another individual S-6 did not know walked over to BEST's white Cadillac Escalade. Thereafter, S-6 gave BEST $1500.00 in pre-recorded funds then BEST and BECTON talked near BEST's vehicle. Later, BEST went into his

car, returned with several blue zip lock bags, and put them in the front pocket of S-6's jacket. S-6

then left the area and gave the bags to the FBI. The contents of the bags weighed approximately 27.1

grams, field-tested positive for the presence of cocaine, and was later confirmed as cocaine by DEA

Laboratory analysis.

C.    **JUDICIALLY AUTHORIZED WIRETAPS**

39.    On September 27, 2005, the Honorable Colleen Kollar Kotelly, United States District

Judge for the District of Columbia, issued an order authorizing the interception of wire

communications to and from mobile cellular telephone number (***) ***-****, the telephone

utilized by FREDERICK MERCER. The FBI intercepted communications to and from this

telephone between September 27, 2005, and October 26, 2005. On October 27, 2005, the Court

issued an order authorizing the interception of wire communications to and from mobile cellular

telephone number (***) ***-****, the telephone utilized by JAMES BECTON, and the FBI

intercepted communications to and from this telephone between October 27, 2005, and November

25, 2005.

40.    On December 16, 2005, the Court issued another order which authorized the FBI to

intercept communications to and from mobile cellular telephone number (***) ***-****, the

telephone utilized by FREDERICK MERCER, and the FBI intercepted communications to and from

this telephone from December 16, 2005, until January 15, 2006. On January 27, 2006, the Court

issued an order which authorized the FBI to intercept communications to and from mobile cellular

telephone number (***)***-****, the telephone utilized by WILLIE BEST, and the FBI intercepted

communications to and from this telephone from January 27, 2006, until February 25, 2006. On

February 24, 2006, the Court issued an order which authorized the FBI to continue to intercept these

communications, and this interception expired on March 27, 2006.

41.    On April 4, 2006, the Court issued an order authorizing the interception of wire communications to and from telephone numbers (***) ***-****, (***) ***-****, and (***) ***-****, all numbers utilized by JAMES BECTON. The FBI began intercepting communications from these telephones on or about April 4, 2006, and interceptions are expected to terminate on or about May 4, 2006.

42.    Intercepted communications derived from these wiretaps and associated with JAMES BECTON, WILLIE BEST, FREDERICK MERCER, SHANNON BEST, and others also demonstrate the existence of a long-term and on-going conspiracy to distribute and possess with the intent to distribute illegal narcotics and commit related crimes. These conversations include, but are not limited to, the following:

43.    <u>Activation # 2605</u>

On October 7, 2005, at approximately 1:45 p.m., Frederick Mercer made an outgoing telephone call and talked with an unknown female at (***) ***-****. During their conversation, Mercer can be overheard having a background conversation with another male who asked Mercer what was up with them guns. Mercer then responded that he had not been anywhere and the male told Mercer that he needed some clips or something and that he had a Mac-11. During further conversation, the male said that he did not have a clip at that point and they discussed, among other things, the murder of Dre by some little ass who the male was tired of. Then the male said he had some bad feelings about something that happened last night and that he had a joint but needed a clip for it.

Investigators believe that during this conversation Mercer and an unknown male discussed

22

firearms and violence and the unknown male's need for a clip for his firearm to be used in a situation on the street that might require violence.

44.    Activation # 2658

On October 7, 2005, at approximately 4:24 p.m., Frederick Mercer received an incoming call from an unknown male at (***) ***-****.  During their telephone conversation, Mercer asked the male if he found that joint and the male said that he got it.  Thereafter, Mercer told him that he wanted him to ask someone about the "new Redskin joint" I got and that nephew just hollered and bought a jersey, a whole jersey, a half a jersey from him.  Mercer then said that he was coming back through there in about twenty minutes after he made a move real quick.

Investigators believe that during this conversation Mercer told an unknown male that he had a supply of cocaine, referred to by code as a "new Redskin joint," and that someone he referred to as nephew just bought cocaine, possibly either a half kilogram or whole kilogram of cocaine, from him.

45.    Activation # 2928

On October 8, 2005, at approximately 1:11 p.m., Frederick Mercer made an outgoing telephone call and ultimately talked with a female believed to be Shannon Best, also known as Big Face, at (***) ***-****.  At the initial part of this call, Mercer talked with Best and he told her to call that motherfucker on the number she had for him.  Later during this call, Mercer stopped talking with Best and talked to a person believed to be James Becton. During their conversation, Mercer told Becton that he was getting calls bright and early and could not contact him.  He later asked Becton if he still had them "two tennis shoes" and Becton responded that they were already gone, them joints from Uma were already gone.  Ultimately, Becton said that he had been out since about six-

23

thirty, and after Mercer asked him why he didn't call his phone, Becton said he thought Mercer was still sleep and that he had been around the area getting it in.  Afterwards, Mercer said that he went in about three o'clock and Becton said he had been getting it in.  Then Mercer said that his shift was about to stop motherfucker, and that was how they were going to do it, on this shift joint.  Finally, Becton said his operation was shut down and they agreed to meet later.

Investigators believe that during this conversation Mercer told Becton that he was receiving calls from customers all morning and ultimately asked Becton if he had drugs, which he referred to by code "two tennis shoes."  Thereafter, they discussed dealing drugs in shifts in a particular area, which primarily would be the 4200 block and 4300 block of Fourth Street, Southeast, D.C.

46.    Activation # 181

On October 28, 2005, at approximately 9:49 p.m., James Becton made an outgoing call to a female believed to be Shannon Best, also known as Big Face, at (***) ***-****.  During their conversation, Becton asked Best where she was at and she said "Wheeler Road."  He then asked her "you got some of them joints with you?" and after she said "yeah," he asked "how many?" and she said "eight."  Becton  then asked her if she was trying to come up to Big D's and she said that she would come up there.

Investigators believe that during this call, Becton asked Best if she still had cocaine, most likely "eight" bags to sell, and she confirmed that she did.  They then agreed to meet at the location called Big Ds, which is a Barbershop and Towing Shop located at 4700 St. Barnabas Road, Temple Hills, Maryland.

47.    Activation # 1165

On November 2, 2005, at 10:54 a.m., Becton received an incoming telephone call from a

24

person believed to be Shannon Best, also known as Big Face, at (***) ***-****. During the conversation, Best tells Becton that "those things" are still in the ashtray. Later when he asks her what she is talking about, she repeats "them things" and Becton then responds "Oh."

Investigators believe that during this call Best advised Becton of the location of some drugs and, in a sense, that drugs that were in the vehicle and needed to be removed or concealed.

48.    Activation # 33

On November 7, 2005, at approximately 5:22 p.m., James Becton made an outgoing call to a male believed to be Willie Best at (***) ***-****. During the call, Becton told Best that he was about to take his urine then he was going to slide around the way. Best then said that he was about to be at Ma's house and that he was a little on "the light side" though, and Becton responded that he would just grab that and that he would just tell them, and that he would owe them later. They then discussed Best seeing a person he described as a "red ho."

Investigators believe that during this call Best, by saying he was on the "light side," told Becton he didn't have all the money to pay for the drugs in a drug deal and Becton advised him that he would take the money he had, pay for the drugs with that, and tell the supplier that he would pay him the rest of the money for the drugs later. Moreover, Carolyn Becton is Best and Becton's mother and she resides at **** Wahler Place, SE, Washington, D.C.

49.    Activation # 11092

On December 31, 2005, at approximately 5:45 p.m., Frederick Mercer received an incoming telephone call from an unknown male at (***) ***-****. During the call, he told Mercer that he was looking for him then he said "we ate breakfast this morning man, and I got man only two eggs left." Mercer then said "oh, for real?" and said "that's ugly right there." Thereafter, the male told Mercer

that he thought he went grocery shopping and Mercer said that he was supposed to have gone but he did not go. He also said that the way he went he had transportation and that he had somebody else driving. Next, Mercer asked the male was he near Big Face's joint and the male said yes and that he was by his house. Mercer then told the male that he could not catch Funk, that he just talked to Big Face, and that she just dropped him off in the house, over that joint. He also instructed the male that his best bet was to breeze through there and holler at him right then and right there for him to give you what you need cause it was hard to catch up with him when his phone was on his charger. Mercer also said that Big Face was out making runs for the night, that Funk was at the house, that the male should call him back. The male then said that he would call him when he was right there.

Investigators believe that during this call a male told Mercer that he sold drugs the previous night and that he only had a "two" quantity of drugs left. Mercer then said he did not get any drugs and he ultimately told the male that Shannon Best, who is known as "Big Face" was out selling drugs that night and that he needed to meet someone nicknamed "Funk" and get drugs from him. This call relates to activation # 11101, which occurred on December 31, 2005, at 6:03 p.m. During this follow-up call, this same male told Mercer that he was at the residence and knocking on the door and no one was there. Mercer then said that he would call "Big Face" (Shannon Best) for him.

50.     Activation # 184

On January 27, 2006, at approximately 6:45 p.m., Willie Best made an outgoing call to a male believed to be Frederick Mercer at (***) ***-****. During their conversation, Best asked him if he already told Tyra to drop him off and Mercer said no and that she just got off work. Mercer then said that he had a "J," commented "you know I'm trying to," and then told Best to bring him that "duck" too. Best then asked him if he did what he asked him to do, Mercer said yes, and Best

26

responded that he would have "that."  Mercer then asked how long he was going to be before he came and Best told him fifteen minutes.

Investigators believe that during this call Mercer told Best that he had marijuana, described as a "J," and that he was trying to get high.  He also instructed Best to bring him some drugs or a weapon, which are described in code as a "duck."  Best agreed to do as requested.

51.    Activation # 796

On January 29, 2006, at approximately 2:50 p.m., Willie Best received an incoming call from an unknown  male at (***) ***-****.  During their conversation, he told Best that "Man" was not on this joint, that he was not answering his joint, and that he was probably "with his Boo-Boo today."  Best then asked him could he catch up with him and he said that he could not and indicated that they were trying to "publish" and trying to "have some space."   Best then commented that the male had been making "some good ass moves," which he also described as "some decent ass moves like a motherfucker" and "some power moves."  He then told the male that he had been doing "better than your boy lately" and commented that he told "that boy" not to buy all of that, but the person would not listen to him, and that he did "not fuck with all that shit" because you need to see how it worked.  Later, he said this person was going "for everything" and even for that "assassin's shit" to see how it worked out.  Best then said he tried to explain to him, it ain't nothing against nobody but you  "see how you like all that shit" cause what you like, the next person, you know what I'm saying, might not . . . .  He then said that he was "mad as a motherfucker" and that he "just dropped all that ole shit" he just "concocted."  Best then said he had to get off the telephone, which he described as this "joint."

Investigators believe that during this call Best advised a co-conspirator that he was impressed

with the amount of drugs he had sold recently, an amount of drug trafficking Best indicated surpasses even his own sales. Best also told the male that what one person likes as drugs another person might not like and that he was upset because he had to discard some crack he "concocted" or cooked because its poor quality. Finally, Best also cautioned the male against acting like another dealer who bought all types of drugs without even knowing its quality.

52.    Activation # 800

On January 29, 2006, at approximately 3:03 p.m., Willie Best received an incoming call from a male believed to be Frederick Mercer at (***)***-****. During their conversation, Best said that he was waiting for "that bitch to come through" and holler at him now and Mercer said that he was going to fuck somebody up because he had a dream last night about his aunt Carolyn. At that point, Best asked him where he was at and he said that he was "around the way." Best then informed Mercer that he wanted him to come meet him and Mercer responded that he did not have any wheels, that his car needed an alternator, and that he had to take care of it this month. Thereafter, Best also said that he did not have a ride and that he was in "this joint trying to bake some fish and shit" then Mercer commented that he had "a broad" that brought him "some shit" last Christmas. The call then terminated.

Investigators believe that during this call when Best told Mercer that he was at "this joint trying to bake some fish and shit," he informed Mercer that he was trying to cook powder cocaine into crack cocaine. The call then terminated after Mercer mentioned that he had drugs, which he described in code as "some shit," that a female brought him in December.

53.    Activation # 1961

On February 3, 2006, at approximately 12:12 a.m., Willie Best made an outgoing call to a

male believed to be Frederick Mercer at (***) ***-****.  During the call, Best asked Mercer if he was around and Mercer replied "yeah, I'm around" and indicated that "it's hot as a motherfucker up here."  Best then asked him about that "joint" and he responded that he did not know what was going on over in that joint.  At that point, Best asked him where "Black" was at and Mercer said that he did not know and that he tried to call him but did not get through.  Best then said that Black told him he was on his way over here but then he saw "all them peoples up there like they, you know what I mean."  He then told Mercer to call someone over there and see what was going on.

Investigators believe that during this call Mercer advised Best of police presence in "the pit," that is, the area (the 4200 block to 4300 block of Fourth Street, Southeast) they frequently sold drugs. Best also inquired about the location of a co-conspirator nicknamed "Black."

54.    Activation # 26

On April 4, 2006, at approximately 3:21 p.m., James Becton made an outgoing call to an unknown male at (***) ***-****.  During the call, he told Becton that he was coming out of an elementary school then Becton told him to come "in the first court."  He then advised Becton that he would call him when he got there.

Investigators believe that this call is significant because Becton instructed someone to meet him in the "first court," a location in the 4200 block of Fourth Street, Southeast, where Becton and co-conspirators primarily sell narcotics.

55.    Activation # 135

On April 4, 2006, at approximately 6:06 p.m., James Becton made an outgoing call to an unknown male at (***) ***-****.  During this call, they discussed fixing a Cadillac.  Later, another unknown male called Becton and asked him if he was in "the area" and Becton said that he just came

home.  At that point, he asked Becton if he had "that joint" with him and Becton responded that he

did not and that he left it right in there.  He then asked Becton if "Son" was up there and Becton

replied that he did not know and that he might be in the "joint."  Thereafter, he instructed Becton to

check for him so he ["Son"] would stop calling him then Becton asked him if he had any "news."

He then responded that "the dude" called him but wanted "twenty-two dollars," and Becton asked

him if what [the price] he "hit" him for that "last one" was "twenty-four."  At that point, he asked

Becton "which one" he was talking about and Becton informed him that he was talking about "the

last time I got from you."  He then said no, asked Becton if he meant the one for which he just gave

him that "money" back, and Becton advised him yes.  Afterwards, he told Becton that the price was

"six for the q," Becton commented to him that "six for a q" was "twenty-four," and he advised

Becton that he was right and that if you purchased all "four" of them it [the price] would have been

twenty-four.     During this conversation, he also told Becton that he [the source] was down to

"twenty-two" now, that he was not "fucking" with that, and that he told him that if he went with the

"two-one" he might go with it.  He also informed Becton that he was tired of people continuing to

crack him, that he did not even grab one, and that the guy called and left him four messages.  He then

said that he was looking for a "one" and said that until he found that, he would probably "chill."

Becton also said that he intended to "chill" and said that he was "waiting now."  Later, this same

male informed Becton that he wanted him to let him know when he heard something.  He also told

him that if he got "desperate" he might call but right now he did not intend to do anything, and that

he had some "vitamins" he was trying to get rid of and he wished he had not purchased them.  He

then asked Becton if he already got rid of all of his, Becton said yes, and he advised Becton that he

was trying to sell "twenty-seven" packs of them.

Investigators believe that during Becton's second conversation they discussed the price of cocaine they wanted a source to reduce the price of cocaine to before they purchased it from him. More specifically, they discussed the price of a quarter (a "q" or 250 grams) of a kilogram (1000 grams) of cocaine for $6,000 ("six"), the dealer's price of selling a kilogram for $22,000 ("twenty-two dollars), and the fact that the person Becton was talking to wanted to wait until the price of the kilogram dropped to $21,000.  They also mentioned during their conversation that this male previously sold Becton a kilogram for $24,000, and the male indicated that the price was lower now. The person identified during their conversation as "Son" is Keith Sampler, also known as "Son-Son," and their reference to both having "vitamins" for sale means they both sell ecstasy pills or some other drug in addition to cocaine.

56.    <u>Activation # 545</u>

On April 6, 2006, at approximately 2:55 p.m., James Becton made an outgoing call to an unknown male at (***) ***-****.  During this call, Becton asked him where he was at and he responded that he was in Laurel with his "folks."  Becton then told him that he was going to bring "that joint" by so they could "see it" then he responded that he was not in the house but his "cousin" was there.  Next, he asked Becton if he had a "little something" and Becton replied that he had "a whole one" then asked the male if he wanted him to take it by and let his cousin see it.  He then replied that he did and said that he would call his cousin so he would come outside when Becton got there.

Investigators believe that during this call Becton talked with a customer and advised him that he had "a whole one," that is, one kilogram (1000 grams) of cocaine for sale.  He then told his customer that he would take it to his cousin and let him look at it so he could decide if he wanted

31

to purchase it.

57.    Activation # 650

On April 6, 2006, at approximately 7:26 p.m., James Becton received an incoming call from an unknown male believed to be Russell Ramseur, also known as "Squirt," at (***) ***-****. During this call, he told Becton that they were "looking good," that he just went ahead and grabbed the little "Q-Street" from his man, and that he could not stand that "twenty-two dollars" right now even though she was "great" and "looked good." Ramseur then told Becton that if he knew anybody looking he should just call him and let him know then Becton said that he needed "some help." He then told Becton again that "twenty-two dollars" had him looking out, that he told a certain person he would get a "Q," and that he would probably catch this person on the next go around because he had to build his "shit" up first. He then instructed Becton to let him know whatever he decided to do and Becton confirmed that he would do so.

Investigators believe that during this conversation Ramseur advised Becton that a source had good quality cocaine to sell, that this source was selling a kilogram of cocaine for $22,000.00 (price coded as "twenty-two dollars"), and that he only purchased a quarter of a kilogram (250 grams or a quarter of a kilogram coded as "Q-Street") of cocaine for him because the price of an entire kilogram was too much for him to pay. Becton also told him that he needed extra money from someone to purchase a kilogram of cocaine and he ultimately agreed to contact Ramseur if he wanted to purchase drugs from the source.

58.    Activation # 757

On April 7, 2006, at approximately 3:57 a.m., James Becton received an incoming call from an unknown male at (***) ***-****. During this call, he asked Becton if he was around and after

Becton said that he was, he told Becton that he needed him and that he had a "slight little situation," which he also referred to as "a little problem."  He then asked Becton if he had "bitch" around with him and Becton told him that he could "hold mine."  He then told Becton that he was on his way to meet him "right now."

Investigators believe that during this call someone advised Becton that he had a problem on the street and needed a gun, which he referred to in code as a "bitch."  Becton ultimately told this person that he could use his firearm if he needed to and the male told Becton he was coming to get it from him at that time.

59.  Activation # 775

On April 7, 2006, at approximately 9:39 a.m., James Becton made an outgoing call to an unknown male at (***) ***-****.  During this call, someone told male talking with Becton on the telephone to ask Becton where the "burners" were at.  Becton then asked him who said that and he responded "Son."  At that point, Becton said that he thought "Da-Da" had them then he responded that they went somewhere last night, that "Da-Da" and "Quan" got both of "them joints," and that they did not show back up last night.  Becton then said that he was about to call "Quan" now and the male advised Becton that he too wanted Becton to call "Quan" and see where they were at.

Investigators believe that during this call Becton and this person discussed "Da-Da" and "Quan" taking two firearms from them the previous night and not bringing them back.  The person identified as "Son" is co-conspirator Keith Sampler, who is also known as "Son-Son" and "Da-Da" is James Becton's younger brother, Khadar Becton.    The firearms are referred to in code by the terms "burners" and "them joints."

60.  Activation # 906

61.     On April 7, 2006, at approximately 6:15 p.m., James Becton received an incoming

call from an unknown male believed to be Shawn Best at (***) ***-****.  During this call, Becton

told him to tell "Peaches" that he needed his "medicine" and Best asked him was his "shit" fucking

up.  At that point, Becton responded, "fuck yeah," and Best asked him if he got him "another car."

Afterwards, Becton advised him that he did not, commented that he had "sixty thousand dollars

worth of cars," and said that he was not buying another car unless it was "a steal."  Becton also said

that he had two Caravans, two Chrysler Concords, two Ford Tauruses, a BMW, an Eldorado, and

an Acura CL.  Best then asked him what year his cars were and how much mileage they had on them

and Best advised him that all his cars were "99s and up" and said that the highest mileage one car

had was a hundred thousand and the lowest mileage one had was fifty-four thousand.  He also said

that his BMW had sixty-two thousand miles.

62.     Investigators believe that this conversation is significant because Becton identified

nine vehicles that he acquired with assets derived from drug trafficking and in violation of the federal

money laundering and drug trafficking statutes.  As such, these vehicles are subject to asset

forfeiture.

63.     <u>Activation # 1026</u>

On April 8, 2006, at approximately 10:43 a.m., James Becton made an outgoing call to an

unknown male at (***) ***-****.  During this call, he told Becton that he was waiting for him in

the "building with Buster."  Becton then instructed him to ask Buster if he had his "money" and he

replied that he [Buster] was out here by himself so he should have it.  At that point, Becton told this

male to tell Buster that someone told him yesterday that he left with that female with a "stack" and

came back with a "short stack."  At that point, another male [Buster] got on the telephone and said

"What's up with you?" and Becton replied "my mother-fucking money, you got it?" He then said that he had "a hundred and something" on him and that he still had "one-eighty worth of shit." Becton then told him that they told him he "cranked out yesterday" before he left with that female then he responded by telling Becton that he did not do what he claimed, that he had "way more than two hundred left," and that he did not come out because the "boys" were out there. Thereafter, Becton told him that he believed he was lying because he [Becton] was out there himself then he advised Becton that he and "White-Boy" stayed in the "joint" all last night and that they were in the "parking" lot. At that point, Becton asked him where was "Da-Da" and he informed him that he was at the apartment with "Son, White-Boy, and Ashton" and that they were asleep. Becton then told him he was about to come around there.

Investigators believe that during this call Becton talked with two males who sold drugs for him in the 4200 block to 4300 block of 4th Street, Southeast. Becton was concerned that Buster had "cranked out" or sold all the drugs and then took the money and spent some of it on a female before coming back with a smaller amount of cash. Ultimately, Buster told Becton that he did not do that, that he had more than a hundred dollars from selling drugs, and that he still had one hundred and eight dollars worth of drugs in his possession to sell. He also told Becton that he stayed in the building and parking lot selling drugs with "White-Boy" and did not come outside because of the police, who he described as the "boys." "Da-Da" has been identified as James Becton's younger brother, Khadar Becton. "Son" is Keith Sampler and "White-Boy" is Larnell Carr.

64.    Activation # 1194

On April 8, 2006, at approximately 7:08 p.m., James Becton made an outgoing call to an unknown male believed to be "Buster" at (***) ***-****. During this call, Becton asked him where

35

he was at and he responded that he was in "the building." He then asked him what was his "status" and he replied "one-thirty." Becton then told him that he had that same thing last night and he said that he did not. Becton then asked him if he was trying to have him believe he had only "seen two people" and he responded that a rack of people were taking turns. Thereafter, they discussed whether Buster was the only male in there and Becton, at one point, asked him if he had been treating females with the money. Later, Becton told him that he was coming to meet him and advised Buster that he needed to give a key back to "Son."

Investigators believe that during this conversation Becton talked with one of his street-level distributors who sold drugs from him in one of the apartment buildings in "the court," the 4200 block of Fourth Street, Southeast. Here, Becton is concerned that Buster is not selling enough drugs and that he is spending the money on women and, as such, he only earned $130.00 from drug sales that day. Buster ultimately explains to Becton that other people were selling drugs too and that is why he only had that amount of money. The person identified as "Son" is co-conspirator Keith Sampler.

65. Activation # 4010

On April 18, 2006, at approximately 6:42 p.m., James Becton received an incoming call from an unknown male at (***) ***-****. During this call, he told Becton to come to his house and see him. He also told Becton that he needed "four" bad, that he wanted them on the "smooth tip," and that he wanted them just "like the last joint" but "just regular." He also advised Becton that they were "turning their nose up" at the "last little bit" then he asked Becton what he wanted for that. Becton then responded that he was going to call someone because he was "all out"right now  then he said that he thought they had it, but it was "soft." He then informed Becton that he wanted it being "soft" and "not even touched" was just the way he wanted it. At that point, Becton asked him

36

if he was sure he only wanted "four" of them and he responded yes, and said that afterwards he intended to come right back and "do something else." He then said that he had a "125" and a "Reggie Miller joint" and that once it was done he would have a little bit off of that. At that point, Becton advised him that he had to call someone else because what he had was the last of the "little joint" he had and, at that point, he told Becton that he had "seven-fifty" for him though. Becton then told him that if he went and got "the same from them" he would go get the "what its name" or bring him with him or something like that and he responded that they were going to need to "see it first" since that last "shit happened" when they "whipped it up." He also said that "the first half of it was right," but when they got down to "the end" they said it was not the same. Thereafter, Becton and he agreed to meet once Becton came from around Iverson Mall.

Investigators believe that during this call Becton and this person discussed a future drug transaction. During their conversation, the unknown male advised Becton that he wanted powdered cocaine ("soft" or "not even touched") as opposed to crack cocaine (cocaine base or "hard" or cooked cocaine). He also told Becton that he already had "125" grams of cocaine and "31" grams of cocaine, which he described in code as a "Reggie Miller," a former and famous basketball player for the Indiana Pacers who wore jersey number "31." Becton and he also discussed the fact that some customers did not like the last quantity of some cocaine and they were refusing to purchase it on the street.

66.  <u>Activation # 4070</u>

On April 18, 2006, at approximately 10:38 p.m., James Becton received an incoming call from an unknown male at (***) ***-****. During this call, he asked Becton what was the number for "this joint right here" and Becton replied that it was "twenty-three five." He then asked Becton

if he meant for the "whole thing" and then asked him if he meant just for "this joint right" here "seven." Becton then told him for that joint right there he would be looking probably like "eight." He then said "all right."

Investigators believe that during the initial part of this call, which relates to activation # 4010, Becton and this same male discussed the price of a whole kilogram of cocaine being $23,500.00. Later, Becton and he discussed cocaine, which Becton referred to in code as "joint," and they discussed prices of "seven" (possibly $7,000.00) and "eight" (possibly $8,000.00).

 67. <u>Activation # 4567</u>

On April 20, 2006, at approximately 6:02 p.m., James Becton received an incoming call from a male believed to be Willie Best at (***) ***-****. During this call, he told Becton that his daughter still had "a cold" and then asked Becton if he still had some "Vics-44, that cough shit." At that point, Becton responded that he did not and told Best that he just "gave the joint away." Best then said that "little dude" just called him and said that his daughter was sick and Becton advised him Best that someone else just beat him to the punch.

Investigators believe that during this conversation Willie Best, talking in a coded language, asked his brother if he still had drugs, which were described as "Vics-44" and "that cough shit." Best wanted the drugs for a customer who just called and requested to purchase it and Becton advised him that he already sold the drugs to someone else.

 68. <u>Activation # 4571</u>

On April 20, 2006, at approximately 6:09 p.m., James Becton received an incoming call from an unknown male at (***) ***-****. During this call, he told Becton that certain people contacted him and were trying to get the "Reggie Miller times two." He then asked Becton what "the

numbers" were on that joint, the soft . . ." then Becton replied "thirteen-five" and then told him to give him a minute so he could do "the math" on it. Becton then said that if it was the same dude from the other day that "joint" would be like "fifteen" and he responded that he wanted "sixteen" and he said "eight a piece." Becton then replied "eight and eight" and he then responded that was what he was talking about. At that point, Becton said that he knew he would go "fifteen" and after he asked Becton if he was saying "fifteen-ten," Becton told him that it would be that unless he wanted it to be "sixteen." Thereafter, he told Best that he did not, that someone had someone else "squashing" him off "fourteen and a half" and then the person went south with the numbers, and that he intended to contact this person and see if the liked "that number," and if he did, he intended to contact Becton so he could "do the do."

Investigators believe that during this call an unknown male contacted Becton and asked him if he could facilitate a drug transaction with another customer for two 31 gram quantities of powder cocaine. Reggie Miller was a famous basketball player with the Indiana Pacers who wore jersey number "31" and during this conversation the two thirty-one gram quantities of cocaine being requested from Becton are described in code as "Reggie Miller times two." The requested drug is powder cocaine, as opposed to crack or hard cocaine, as identified by the term "soft." Becton ultimately advised the caller that the price would be $1,500.00 for sixty-two grams (two 31s) of powder cocaine and the caller informed Becton that if the customer agreed to that price he would call Becton again so he could complete the deal.

69.    Activation # 4586

On April 20, 2006, at approximately 7:45 p.m., James Becton received an incoming call from an unknown male at (***) ***-****. During this call, he told Becton that he was trying to get from

him the "joint" like he "regularly" gets when he sees him, but this time it was for his "peoples."  He

also told Becton that he wanted what he "regularly" does, "both of them," and that it was for his

"peoples."  At that point, Becton asked him was he ready now and he responded by saying that she

was coming to see him now and that they would be in route and then asked Becton if all he had to

do was see "Shorty."  Becton then responded "yeah, yeah" and he told Becton that he intended to call

him when he was ready for him to "trip" him and that he wanted Becton to go ahead and tell him to

get it ready for him.  Becton replied "all right."

Investigators believe that during this call a customer contacted Becton and informed him that

he needed to get the same type of drugs that he "regularly" or usually got from him and that he

wanted two or both of them for a female that was coming with him.  Becton ultimately agreed to

have "Shorty," one of Becton's street-level distributors, prepare the drugs for delivery and then give

it to the customer once he contacted Becton and advised him he was present with the female he was

making the purchase for.

70.    Activation # 4802

On April 22, 2006, at approximately 5:36 p.m., James Becton received an incoming call from

an unknown male believed to be Jamal at (***) ***-****.  During this call, Becton asked him what

was up with him and he responded "them girl things" and "ten of the girl things."  Becton then told

him to stop it and once he told Becton that he was telling him and that he should call "Shannon,"

Becton advised him that Shannon might have "them joints" and that he could call his other "little

man" and he had "them joints."  He then told Becton to call Shannon because she was not answering

her telephone and he agreed to do so.

Investigators believe that during this conversation one of Becton's street-level drug

distributors advised him that he needed a "ten" quantity of drugs, which he described in code as "them girl things." Becton ultimately advised him that "Shannon," a person identified by agents as co-conspirator Shannon Best, and one of his other street-level distributors had that quantity of drugs in their possession at that time.

71.    Activation # 4938

On April 23, 2006, at approximately 8:17 p.m., James Becton received an incoming call from an unknown male at (***) ***-****. During this call, Becton told him that he had them "what's a name" for him then he asked Becton where he was at. At that point, Becton responded that he was in "the house" and after he asked Becton was he coming out, Becton told him yes and asked him where he was going to be at. He then informed Becton that he was coming from down Seventh Street and he then agreed to contact Becton when he got on his side of town.

Investigators believe that during this call Becton informed a customer that he had drugs for him, and he described the drugs in code as "what's a name." This call is also significant because Becton said that he was at home, a residence agents have identified as **** Addison Road, South, District Heights, Maryland, and during this conversation he agreed to come from his home and deliver drugs to a customer. As such, Becton keeps a supply of illegal drugs or contraband at his residence for future delivery to customers.

72.    Agents had planned to execute a series of search warrants on May 2 or 3, 2006 in the 4200 and 4300 blocks of Fourth Street, SE, in Washington, D.C. In preparation for those warrants, on May 1, 2006, a police officer obtained access keys to the target locations from the property management. This officer had obtained keys and access cards on previous occasions. Your affiant believes that after providing both keys to the lockout doors of the target buildings as well as the

target apartments, an employee who works in the property management office, contacted WILLIE BEST and advised him of the police interest. Based on intercepted conversations, the employee contacted CAROLYN BECTON as well and informed her of the police interest. Agents did not execute the warrants as originally planned. Although members of this narcotics conspiracy temporarily slowed their activities in the target area, recent reports from MPD officers indicates that the narcotics activity has returned to normal.

## V.    LOCATIONS TO BE SEARCHED

### A.    **** STANTON ROAD, SE, APARTMENT # ***, WASHINGTON, D.C.

#### 1.    Description of the Premises

73.    This search site is described as an apartment located in the Stanton Glen Apartments, located on the right side of Stanton Road as you exit the Suitland Parkway. Building **** is the first building on the left as you make the first left inside the gates of the complex. Building 3092 is located on the north side of the building in the northeast corner of the building. The building is a yellow brick, split level, multi-family structure with white trim. The number "****" is located on the front of the building in black, and is visible from the parking lot. The building has a concrete sidewalk in the front of the building with steps leading to the front glass door of the apartment building. Once inside the apartment building, there is a stairway going down to the right and one going up to the left. Take the up stairway (on left) to the second level, where there are four apartments. Apartment *** is the third apartment from the left with a tan door and the numbers "***" affixed horizontally on the front of the door.

#### 2.    Connection of Shannon Best to Address

74.    **** Stanton Road, SE, Apartment #***, Washington, D.C. is the residence of

SHANNON BEST, also known as "Big Face." Best identified herself for purposes of obtaining a District of Columbia driver's permit at the address of **** Stanton Road, SE, Washington, D.C., and this operator's permit expires on February 23, 2009. Moreover, according to the AutoTrack Database, which is a database associated with credit history, Shannon Best listed **** Stanton Road, SE, Washington, D.C., in or about May 2005.

3.    Probable Cause as to Shannon Best & Address

75.    In addition to intercepted communications more fully described herein, numerous conversations intercepted during the wiretap also establish SHANNON BEST's involvement with drug trafficking with co-conspirators FREDERICK MERCER, JAMES BECTON, AND WILLIE BEST. These include:

76.    Activation # 468

On January 28, 2006, at approximately 5:55 p.m., Willie Best received an incoming call from a person believed to be James Becton at (***) ***-****. During their conversation, Best asked Becton what was up with "cousin" and Becton responded that he was "ready." He then told Becton to call him and see if it's "a real deal" and then call him right back. Becton then told him that he already knew because he was about to go himself. Best then said that "Shannon" just said she was "good" but did not know what was "the deal with it," and acted like it was "a problem" with it. Becton then told him that was not the case. Later, he also told Best that he was by Iverson Mall and Best told him that he was about to ride out to "Whitey's house" and that he needed to "holler at that broad" right now and for real. Becton then said he was about to call him back and that he would talk with Best later.

Investigators believe that during this conversation, Best and Becton discussed putting

together a drug transaction which involved them as well as Shannon Best and a third person identified as "cousin." Willie Best informed James Becton that Shannon Best was "good" and ready to do her part in the drug deal but thought there might be a problem with completing the deal and Becton ultimately informed Best that there were no problems with it and that the third person was ready.

77.    Activation # 4230

On April 19, 2006, at approximately 3:13 p.m., James Becton made an outgoing telephone call to a person believed to be Jamal Ramsey, also known as "Spook," at (***) ***-****.  During their conversation, Becton told him "Shannon got them" and Ramsey responded that he called her the other day and she said that she did not have any.  Becton then asked him if she said that she did not have any more then Ramsey said that on Friday she did not have any "unless she got them now." Becton then told him that he did not know but he should call her because she probably does now. At that point, Ramsey said "all right" and that he intended to go ahead and get it out of the way.

Investigators believe that during this call Becton informed one of his street-level drug distributors that Shannon Best had drugs (referred to as "them") for him to sell and he informed Becton that on Friday Best told him that she did not have any.  Ultimately, Becton, the leader of the drug trafficking enterprise with Willie Best, informed Ramsey to call Shannon Best again because she probably had drugs for him now.

78.    Activation # 4802

On April 22, 2006, at approximately 5:36 p.m., James Becton received an incoming call from an unknown male believed to be Jamal Ramsey at (***) ***-****.  During this call, Becton asked him what was up with him and he responded "them girl things" and "ten of the girl things."  Becton

44

then told him to stop it and Ramsey ultimately told Becton to call "Shannon." Thereafter, Becton advised him that "Shannon" might have "them joints" and then told him that he could call his "other little man" because he had "them joints." At that point, Ramsey instructed Becton to call Shannon because she did not answer her telephone and Becton agreed to do so.

Investigators believe that during this call drugs are referred to in code as "them girl things" and the quantity of drugs for the transaction is referred to as "ten." During their conversation, one of Becton's street-level drug distributors, Ramsey, advised Becton that he needed a "ten" quantity of drugs and Becton ultimately advised him that Shannon Best, a drug distributor like Becton's "other little man," had that quantity of drugs in her possession at that time.

79. <u>Activation # 2455</u>

On April 25, 2006, at approximately 7:57 p.m., an unknown male used James Becton's telephone and made an outgoing call a female believed to be Shannon Best at direct connect number (***) ***-****. During this conversation, an unknown male told "Shannon" to "look under both shoe pads all the way in the back against the wall and get all of it." She then told him that she would call him when she got back to her house.

Investigators believe that during this call an unknown male directed Shannon Best to look in a specific location in her home wherein he, as a member of her drug network with James Becton, had stashed some cash or drugs inside her home.

80. Based on all of the above, your affiant submits that there is probable cause to believe that evidence and instrumentalities of the crimes described above, specifically documentation in the names of JAMES BECTON, WILLIE BEST, and SHANNON BEST are contained/secreted at 3092 Stanton Road, SE, Apartment #203, Washington, D.C.

**B.    \*\*\*\* Wahler Place, S.E., Washington, D.C. (Home of Carolyn Becton)**

1.    Description of the Premises

81.    The premises located at \*\*\*\* Wahler Place, SE, Washington, D.C., are described as a single family, three story town house, with light grey vinyl siding with white trim and burgundy shutters. The structure has concrete steps with black metal rails leading to the entrance of the townhouse. The structure has a covered porch supported by two white columns. The number "\*\*\*\*" is located on the front of the building in black letters, and is visible from Wahler Place, SE. A concrete sidewalk runs in front of the townhouse, and the front door is white metal.

2.    Connection of Carolyn Becton to Address

82.    Carolyn Becton resides at \*\*\*\* Wahler Place, S.E.  This information has been provided by S-1 and S-2 and has been confirmed by Investigators.  As noted above, several of the telephones lines that were intercepted were subscribed to by CAROLYN BECTON and the address she gave to the cellular telephone companies was this address.  For example, the first BECTON line that was intercepted (\*\*\*-\*\*\*-\*\*\*\*) and the BEST line (\*\*\*-\*\*\*-\*\*\*\*) were both in her name. According to the AUTOTRACK database, JAMES BECTON has previously provided this location as his address between December 2004 and April 2006.

3.    Probable Cause as to Carolyn Becton and Wahler Place

83.    \*\*\*\* Wahler Place, SE, Washington, DC is the residence of CAROLYN ROMAINE BECTON MOODY, the mother of JAMES BECTON, WILLIE BEST , SHANNON BEST and KHADAR BECTON.  CAROLYN BECTON is employed by the District of Columbia Housing Authority, and over the years, continues to facilitate her children's criminal activities by routinely obtaining cellular phones for them, registering vehicles and other property in her name, as well as

producing false and fraudulent payroll information for them and her nephew FREDERICK MERCER, to attempt to "legitimize" their activities for use in court proceedings or to obtain new residences. During each of the periods of interception, your affiant and other law enforcement personnel learned that CAROLYN BECTON was the subscriber of a number of cellular phones used by BEST, SHANNON BEST and other members of her family.    Additionally, this address is used by both BECTON and BEST, and they have provided it to law enforcement and court personnel on a number of occasions.

84.    As noted above, investigators received authorization to intercept the communications of James Becton on October 27, 2005 when he was using telephone (***) ***-****.  This telephone is subscribed to by CAROLYN BECTON at **** Wahler Place, SE, Washington, D.C.  That 30 day period of authorization expired on November 25, 2005.

a.    On October 31, 2005, an outgoing call was intercepted from BECTON's phone to telephone number (***) ***-**** (CAROLYN BECTON's telephone) Activation # 863). During this conversation, BECTON told his mother that he had two upcoming court dates. CAROLYN BECTON told BECTON that she had to look the dates back up and would call him back. Investigator's believe that this call demonstrates CAROLYN BECTON keeps paperwork and records related to BECTON at her residence.

b.    On November 17, 2005, an outgoing call was intercepted from BECTON's telephone to (***) ***-****, CAROLYN BECTON's telephone (Activation #1216). During this conversation, CAROLYN BECTON reminded BECTON that he had another court date coming up. CAROLYN BECTON told her son "they are going to lock your ass up," and she told BECTON she would call him the day before each of the court dates to remind him to appear. Investigators believe

this conversation confirms the existence of paperwork related to the activities of BECTON at CAROLYN BECTON'S home.

85.     As noted above, investigators received authorization to intercept the communications of WILLIE BEST on January October 27, 2005 when he was using telephone (***) ***-****.  This telephone is subscribed to by CAROLYN BECTON at 1117 Wahler Place, SE, Washington, D.C. That authorization period was extending for an additional 30 days that expired on March 27, 2006. On January 29, 2006, an outgoing call was intercepted from BEST's telephone to (***) ***-****, CAROLYN BECTON's phone (Activation # 734).  During this conversation, BEST and his mother discussed  the registration and tags for a vehicle registered to CAROLYN BECTON. The tags and registration had expired and could not be renewed due to over $1000 of tickets which DEBORAH JONES got while driving the vehicle. [1]        Investigators believe ths conversation confirms that CAROLYN BECTON has at her home paperwork related to vehicles used by Deborah Jones and Willie Best.

86.     As noted above, investigators received authorization to intercept the communications of James Becton on April 3, 2006 for telephones (***) ***-****, (***) ***-**** and (***) ***-****.  That 30 day period of authorization is ongoing.

        a.      On   April 6, 2006, an outgoing call was intercepted from BECTON's telephone to CAROLYN BECTON's telephone number (***) ***-**** (Activation# 597).  During

---

[1]      Your affiant knows that in October of 2004, DEBORAH JONES  and WILLIE BEST were arrested in North Carolina,  along with BEST's cousin,  after a traffic stop yielded four kilograms of powder cocaine.  BEST paid for an attorney for both he and JONES, and the charges were dismissed without prejudice, while his cousin was sentenced to a number of years in jail.  Your affiant also knows that in January 2004, BEST and JONES were arrested in the District of Columbia and charged with Possession with Intent to Distribute Crack Cocaine.  That case was no-papered.

this conversation, CAROLYN BECTON told JAMES BECTON that he got something in the mail the previous day from a loan company;   that it was a big package and he needed to fill out some papers for the new house. BECTON told his mother not to open any more of his stuff, since she ended up losing it.  Your affiant knows from other authorized interceptions that BECTON had applied for a loan in connection with a purchase of a $400,000 home.  Your affiant also knows that BECTON is not employed and does not have any legitimate income that would qualify him to obtain such a loan.

b.    On April 24, 2006, an outgoing call was intercepted from BECTON's telephone to CAROLYN BECTON's   phone (Activation# 5019).   During this conversation, BECTON asked his mother if she would switch his phone. She said she had to switch out one of her daughter's phones as well, and agreed to do it later that evening.

87.    Based on all of the above, your affiant submits that there is probable cause to believe that evidence and instrumentalities of the crimes described above, specifically documentation in the names of JAMES BECTON and WILLIE BEST, are contained/secreted at 1117 Wahler Place, SE, Washington, D.C.

**C.    \*\*\*\* Fourth Street, S.E. Apt. #\*, Washington, D.C. (Stash House)**

1.    Description of the Premises

88.    The premises located at \*\*\*\* Fourth Street, SE, Apartment #\*, Washington, D.C. (First Court) is described as a  multi-family dwelling (apartment building) located in the first court on the right side of  Fourth Street, SE, after you cross Chesapeake Street, SE.  Building \*\*\*\* is located on the right side of the court as you enter. The building is a two story brick structure, with brown trim. The building has a concrete sidewalk with brown metal rails leading to the entrance of

the building. The entrance has a brown metal roof with brown columns over the doorway. A white sign with the number "****" is affixed on the front of the entrance and can be seen from the parking lot. The front door (lock out) of the building is brown metal with a plate glass window and a silver metal handle. The apartment is located on the first floor and has a brown door with the numeral "*" on the knocker. Your affiant believes this location is a stash location used by BECTON and his associates.

       2.    <u>Connection of Conspirators to Address and Probable Cause</u>

89.    S-1 advised your affiant that BECTON was utilizing **** Fourth Street, SE, Apartment #1 to stash quantities of drugs and money. S-1 stated that inside this apartment, which S-1 believes is a studio apartment located in building ****, was a pit bull which BECTON had gotten from BEST to protect his stash of drugs, money and weapons. S-1 stated that a neighbor in the building had complained to the building management that the dog would not stop barking and there was a notice posted on the front door of this apartment for the occupants to remove the animal from the apartment. Rent roll records reflect a MARKINDA FAISON is the lease holder of this apartment. Your affiant knows that the FAISON family is related to the BEST and BECTON families. Investigators have not been able to independently confirm whether Ms. Faison still resides in this apartment.

90.    Further, S-1 stated that a co-conspirator's of BECTON advised S-1 that BECTON controls this apartment. S-1 indicated that it observed BECTON's pit bull dog in the vicinity of this apartment being taken care of by an unidentified black male whose first name is believed to be Buster. When S-1 asked where the dog was maintained, one of BECTON's co-conspirator advised S-1 that the dog was kept in Apartment 1 of **** Fourth Street, S.E. Intercepted conversations have

confirmed that a male identified as BUSTER takes care of BECTON's dog and has spoken with BECTON about drugs and money owed for drugs.

91.    During these periods of interception, BECTON obtained a master key for the apartments in the courts. S-1 stated that for the most part, BECTON has turned over much of the day to day drug sales and daily operations of this criminal organization to another individual, known only as "LIPS." "LIPS" is described as a black male, approximately 21 years of age, who often holds the key to this apartment. Another individual, KEITH SAMPLER, aka "Son Son", another close confidante of BECTON, also holds the key and, with LIPS, controls the access to this apartment. SAMPLER and his girlfriend, ASHLEY BRODIE, along with LIPS, make deliveries for BECTON, as well as deliver proceeds from drug sales to him and retrieve weapons, or "burners," from this location for crew members as needed or as directed by BECTON.

92.    As noted above, investigators received authorization to intercept the communications of James Becton on April 3, 2006 for telephones (***) ***-****, (***) ***-**** and (***) ***-****. That 30 day period of authorization is ongoing.

a.    On April 6, 2006, an outgoing call was intercepted from the target telephone (***) ***-****, utilized by BECTON to (***) ***-**** (Activation # 722). During this conversation with a female known only to investigators as JANELLE LNU, BECTON was also intercepted utilizing his Nextel phone (***) ***-****, via the "Direct Connect" feature, advising that he, too was in the first court, and he wanted to know who had the key, that he was about to exit his vehicle.

b.    On April 8, 2006, an incoming call was intercepted from telephone number (***) ***-****, utilized by JANELLE LNU, to target telephone (***) ***-**** (Activation # 1142). During this conversation, JANELLE asked BECTON if he had "that," and asked where he was so

51

she could "get a little something." BECTON told her to meet around Fourth, in the first court, where they were last night.

       c.    On April 8, 2006, an outgoing call was intercepted from the target telephone (\*\*\*) \*\*\*-\*\*\*\* to (\*\*\*) \*\*\*-\*\*\*\* (Activation# 1154). During this conversation, BECTON and an unknown male discussed going to the "other court" and hooking up with an unknown female who was in the first court and to see what she wanted. BECTON also asked LIPS if those "other joints, not the vitamins, were all ready, already." Your affiant believes that "those other joints" was a reference to crack cocaine, and the vitamins was a code word for ecstacy. BECTON was also overheard to say that both BUSTER and LIPS were in the first court.

       d.    On April 8, 2006, at approximately 11:48 a.m., your affiant learned that a champagne color four door Lincoln Navigator, bearing Maryland tag, 79583 BY, was parked in front of \*\*\*\* Fourth Street, SE, Washington, D.C. This vehicle was unoccupied, but your affiant, as well as other law enforcement personnel have observed JAMES BECTON driving this vehicle, and have observed this vehicle parked in front of BECTON's residence at \*\*\*\* Addison Road S, District Heights, Maryland.

       e.    On April 10, 2006, an outgoing call was intercepted from target telephone (\*\*\*) \*\*\*-\*\*\*\* to \*\*\*-\*\*\*-\*\*\*\* (Activation# 1559) . The interception of wire communications to and from this telephone is ongoing. During this conversation, BECTON discussed an upcoming trip to Disney World. BECTON could also be heard on his Nextel (target telephone (\*\*\*) \*\*\*-\*\*\*\*). BECTON "clicked over" to another call, where an unknown male told BECTON he wanted "that" tonight. BECTON told him that if he wanted it tonight, he could get it, and that BECTON would soon be in the first court. In the background, BECTON was overheard talking to unknown

52

individuals about the color of bags, and the color yellow. BECTON also stated that BUSTER needed to stop spending BECTON's money and wanted to know if BECTON's money was in order.

       f.     On April 19, 2006, an outgoing call was intercepted from target telephone (***) ***-**** to (***) ***-**** (Activation# 4112). The interception of wire communications to and from this telephone is ongoing. During this conversation, BECTON and his wife, GINA TAYLOR BECTON were discussing the titles to several vehicles. BECTON "clicked over" to another call and was also overheard talking to KEITH SAMPLER on the Nextel phone (***) ***-****, via the Direct Connect (Push to Talk) feature. SAMPLER told BECTON he was in the first court with BUSTER and LIPS. BECTON told SAMPLER he was coming through since he needed to get $100.00 to put in a bank account of one of his baby's mothers.

       g.     On April 6, 2006, an incoming call (via Direct Connect) was intercepted to target telephone (***) ***-****, hereinafter referred to as "BECTON's Nextel phone." During this activation, (Activation# 418), an unknown male told BECTON he had the key and was in the first court. BECTON told the unknown male that he, too was in the first court and that he would be out of his car shortly.

    93.    Based on all of the above, your affiant submits that there is probable cause to believe that evidence and instrumentalities of the crimes described above are contained/secreted in the apartment located at **** Fourth Street, SE, Apartment *, Washington, D.C., located in the first court.

### D.    **** Fourth Street, S.E., Washington, D.C. Apartment # * (Stash House)

1.    Description of the Premises

    94.    The premises located at **** Fourth Street SE, Apartment #*, Washington, D.C.,

is described as a brick multi unit apartment building. The number "****" is posted on the front entrance of the apartment building itself, in white, and affixed to a brown placard. Apartment #* has a brown door, with a metallic door knocker. The number "2" is posted on the center of the apartment door.

2.    Connection of Conspirators to to Address and Probable Cause

95.    S-7 has advised investigators **** Fourth Street, SE, Apartment #*, Washington, D.C. is the residence of RASHEEDA BALL, aka Ray Ray.  Earlier this year, a reliable confidential source purchased drugs on at least two occasions, from BALL  in the second court and advised your affiant that BALL came from the building located at ****.  S-7 has also advised that BALL is romantically associated with a black male known only to your affiant as PEANUT who in turn is associated with DARYL DRIVER, aka Tutu. According to S-7, although BALL is involved with PEANUT, she allows him, DRIVER and other individuals distributing drugs in the second court  to run into her apartment to hide from or elude law enforcement.  Intercepted conversations have confirmed that DRIVER is a narcotics co-conspirator of BECTON and BEST.

96.    On April 13, 2006, the confidential source purchased drugs from DRIVER in Building ****, and on April 23, 2006, the same confidential source purchased drugs from PEANUT inside Building **** in the second court.

97.    On April 27, 2006, S-7 observed a number of individuals associated with PEANUT run into BALL's apartment when the police came into the second court.  Law enforcement personnel are aware that this building is a location where there is a high incidence of drug trafficking activity. This source has observed BALL,  DRIVER and PEANUT sell drugs in the hallway of **** Fourth Street, SE.  The source stated for the most part, these individuals hold the crack cocaine in bags in

their hands or on their person. When enforcement action occurs, these individuals run into BALL's apartment, until the police leave the area. S-7 also stated these individuals have jumped out of BALL's bedroom window in order to get away from the police. Further, DRIVER has provided "walkie talkies" to several "crack heads" in the area to alert them to police presence.

98.     Based on all of the above, your affiant submits that there is probable cause believe that evidence and instrumentalities of the crimes described above are contained/secreted in the apartment located at **** Fourth Street, SE, Apartment #2, Washington, D.C., located in the second court.

**E.     **** Fourth Street, S.E., Aartment # *, Washington, D.C. (Stash House)**

**1.     Description of the Premises**

99.     The premises located at **** Fourth Street SE, Apartment #*, Washington, D.C., is described as a brick multi unit apartment building. The number "****" is posted on the front entrance of the apartment building itself, in white, and affixed to a brown placard. Apartment #* has a brown door, with a metallic door knocker. The number "*" is posted on the center of the apartment door. The apartment is located on the second floor.

**2.     Connection of Conspirators to Address and Probable Cause**

100.     Rent roll records reflect that **** Fourth Street, SE, Apartment #*, is rented by a CHRISTINE JACKSON. Several confidential sources, including S-1 and S-7 have advised your affiant that a dark complected female, known only as SUNSHINE, resides in Apartment #5. SUNSHINE allows individuals to run into her apartment when the police enter the area. The source advised your affiant that when SUNSHINE leaves her apartment, she leaves the key with someone for the sole purpose of utilizing the apartment if the police enter the second court. It is not known

if SUNSHINE and CHRISTINE JACKSON are the same individual.

101.     On April 27, 2006,  your affiant learned that officers from the Metropolitan Police Department "jumped out" in the second court. The source observed several individuals run into JACKSON's apartment when the police came into the court. This source advised law enforcement personnel that these individuals hold the crack cocaine in either their hands or on their persons at their derriere's.  S-7 has observed, on other occasions, when the police enter the second court, these individuals who are in the area selling drugs and are associated with JAQUAN BEST aka WOP, run into JACKSON's apartment to get away. The source also stated that SUNSHINE was involved with JAQUAN BEST, aka WOP, a cousin of JAMES BECTON.  Interceptions have confirmed that JAQUAN BEST aka WOP is a narcotics co-conspirator of BECTON and BEST.  Investigators also know that JAQUAN BEST has a prior conviction for Possession with Intent to Distribute while Armed.

102.     On April 7, 2006, an incoming call was intercepted from telephone number (***) ***-**** to the target telephone (***)***-****.  During this conversation with an unknown female, BECTON told her that she needed to meet his cousin, WOP, whom he described as short with dreads. BECTON told this female that WOP was messing with SUNSHINE. Via the Direct Connect feature on his Nextel phone (Activation # 759), BECTON told WOP he could give him his big one (a gun) with the light on the front. WOP said he was around the way (on Fourth Street) but he would meet BECTON at his house on Addison Road to get the weapon since he was about to "move one."

103.     Based on all of the above, your affiant submits that there is probable cause to believe that  evidence and instrumentalities of the crimes described above are contained/secreted in the apartment located at **** Fourth Street, SE, Apartment #*, Washington, D.C., located in the second

court.

**F.    **** Fourth Street, S.E., Washington, D.C. Apartment # * (Stash House)**

    1.    Description of the Premises

104.    The premises located at **** Fourth Street SE, Apartment #* Washington D.C;

described as a brick multi-family dwelling located in the second court, in the **** block of Fourth

Street, SE. Building **** is the first building on the right as you enter the court from Fourth Street,

SE. The numerals "****" are posted upon the front entrance of the apartment building itself with

white colored numbers affixed to a brown placard.  The number "*" is posted on the door.

    2.    Connection of Conspirators to to Address and Probable Cause

105.    The resident rent roll records reflect BERNARD BRIGGS as the lease holder of

Apartment #*.  A check of the records maintained  in the Washington Area Law Enforcement

System (WALES) revealed that BERNARD BRIGGS, aka FATS, aka HEAVY,  is a  Black Male,

5'8", 375 lbs.  A confidential source who recently began cooperating with the FBI advised  that on

numerous occasions, it has observed LIPS, SON SON, (KEITH SAMPLER), "P," (JAMES

BECTON), JAMAL (JAMAL RAMSEY), and DRE (JOHNNY HODGE),  in the hallway of ****;

on the front steps of ****, and in Apartment #* , often when police enter the second court. This

source stated that the people that hang in Building **** are associated with JAMES BECTON. This

source also stated that FATS, or HEAVY,  lives on the first floor of this building. The source

described this individual as a black male in his forties, weighing more than 300 pounds. The

information provided by the source has been corroborated by independent investigation.

106.    As noted above, investigators received authorization to intercept the communications

of James Becton on April 3, 2006 for telephones (***) ***-****, (***) ***-**** and (***) ***-

****.  That 30 day period of authorization is ongoing.

      a.     On April 10, 2006, an outgoing call  was intercepted from target telephone (***) ***-**** to telephone number (***) ***-**** (Activation #1373).  During this conversation, BECTON asked an unknown male who was on Fourth Street last night. BECTON wanted to know how business was in the apartment? The unknown male told BECTON that "HEAVY almost got everybody 100 years last night." BECTON wanted to know what happened? The unknown male told BECTON that HEAVY had opened the door for the "feds," (police) and the "feds" said they were going to bring the white shirts (Agents). BECTON said, "hey, I say smack the goddamn ass shit on his ass."

      b.     On April 13, 2006, an incoming call was intercepted via Direct Connect from ************** to the target phone (Activation #1159). During this conversation, BECTON asked where SON SON was. An unknown male told BECTON that SON SON was on HEAVY's phone. BECTON told the male that he had forgotten the male needed "plant and shit." The unknown male told BECTON he would call him as soon as he got up.

      c.     On April 15, 2006, an incoming call was intercepted from telephone number (***) ***-**** to target telephone (***) ***-**** (Activation # 2719).  During this conversation, BECTON questioned BUSTER as to if he had sold all of his drugs, then why did he not have BECTON's money?  BUSTER told BECTON that some of the people he had sold to still owed him money. BECTON asked BUSTER what did I tell you about that the first time? BECTON told BUSTER he was sending him back out to get the money with some others who were distributing drugs for him. He asked BUSTER for a phone number, and BUSTER told BECTON his phone was in HEAVY's house.

d.    On April 25, 2006, an outgoing call was intercepted from target telephone (\*\*\*) \*\*\*-\*\*\*\* via Direct Connect to \*\*\*-\*\*\*-\*\*\*-\* (Activation # 2444).  During this conversation, BECTON asked an unknown male where he was. The male replied he was about to go into HEAVY's house and watch the game. BECTON asked the male "where LIPS was at?" The unknown male told BECTON that LIPS was right there. BECTON told the unknown male to ask him what's good?

107.    On April 27, 2006,  your affiant learned that officers from the Metropolitan Police Department "jumped out" in the second court. S-7 observed several individuals run into HEAVY's apartment when the police came into the court. The individuals that ran into HEAVY's apartment included KEITH SAMPLER aka Son-Son and LIPS.  Interceptions have confirmed that SAMPLER and LIPS are narcotics co-conspirators of BECTON and BEST.

108.    Based on all of the above, your affiant submits that there is probable cause to believe that  evidence and instrumentalities of the crimes described above are contained/secreted in the apartment located at \*\*\*\* Fourth Street, SE, Apartment #\*, Washington, D.C., located in the second court.

**G.    \*\*\*\* Fourth Street, S.E., Apartment #\*\*\*, Washington, D.C.**

1.    Description of the Premises

109.    The premises located at \*\*\*\* Fourth Street SE, Apartment #\*\*\*, Washington, D.C., is located  in the 4200 block of Fourth Street, SE, an area known as the "pit," and in the Atlantic Gardens Apartment Complex.  The building is located on the left (east) side of Fourth Street, SE, after crossing over Chesapeake Street, SE.  This building is described as a multi-family, multistory brown brick building and the numbers "\*\*\*\*" and "\*\*\*" are positioned on a placard to the left of

the front door for apartment number "***."  Apartment number "***" has its entrance on the street

(ground) level and on the side of the building, has its own separate entry from the street, and the

numbers "****" and "***" are clearly visible on the placard for the apartment.

2.    Connection of Damien Thompson to Address

110.    On May 17, 2005, Seventh District Metropolitan Police Department (M.P.D.) officers

arrested DAMIEN THOMPSON in the 4200 block of Fourth Street, SE, D.C., for possession with

the intent to distribute cocaine.    On August 10, 2005, and October 26, 2005, law enforcement

officials interviewed THOMPSON and during these meetings THOMPSON admitted, among other

things, that he was a drug (cocaine) dealer.  He also stated in August of 2005 that he lived at ****

Barrowfield Court in Fort Washington, Maryland, that he worked the midnight shift at a Shoppers

Food Warehouse, and that after work ended he usually went to the 4200 block of Fourth Street, SE,

to help care for his daughter, who lived with KEISHA GRIMES, the baby's mother, at **** Fourth

Street, SE, D.C.  In February of 2006 agents confirmed through an examination of rental records that

LAKESHA GRIMES was the leaseholder of Apartment ***, **** Fourth Street, SE, Washington,

D.C.

111.    A May 16, 2006, Lexis-Nexis database check for Lakisha Grimes indicates her

current address is Apartment # *** at **** Fourth Street, SE, D.C.

3.    Probable Cause as to Damien Thompson

112.    On November 1, 2005, officers made a controlled purchase of illegal narcotics in the

4200 block of Fourth Street, SE, D.C.  On this date, a Cooperating Witness (CW) entered  the

parking lot located in front of the Atlantic Gardens Apartment Complex in the 4200 block of Fourth

Street, SE, Washington, D.C.  This area is known as the "pit."  During this time period, the CW

observed two black males standing near a white vehicle parked in the pit.  One of these individuals, later identified by the CW and law enforcement personnel as FREDERICK MERCER, got into the back seat of the CW's vehicle.  At that point, MERCER sold the CW approximately $50.00 worth of cocaine as the second individual got into the front seat of the CW's vehicle.  Thereafter, this second person informed the CW that he, too, wished to sell CW drugs.  He, this second individual, then exited the CW's vehicle, went to the white BMW vehicle parked nearby, and returned shortly thereafter.  He then leaned inside the CW's vehicle on the passenger's side, dropped a small plastic zip lock bag containing a white rock-like substance on the front passenger's seat of the CW's vehicle, and suggested to the CW that the quality of the drugs was very good.  Subsequent to these events, officers from the surveillance team reviewed the videotape of the purchases and identified DAMIEN THOMPSON as the second individual who provided the CW what ultimately tested positive for cocaine.

113.    According to S-1, during the first week of May of 2006, S-1 was on Fourth Street, SE, D.C., when S-1 spoke to a co-conspirator of WILLIE BEST.  This person told S-1 at that time that he was trying to get a half ounce of crack cocaine from WILLIE [BEST] but that "Willie would not return his phone calls."  During this time period, BEST walked up near them and then "stepped off" with the co-conspirator.  Thereafter, S-1 observed the co-conspirator talking to DAMIEN THOMPSON and shortly thereafter saw the co-conspirator with crack cocaine.  The co-conspirator also told S-1 that it got the cocaine in its possession from Thompson.

114.    Based upon intelligence known to S-1, BEST rarely, if ever, did hand-to-hand drug transactions himself and would generally use others to hold and distribute drugs for him.  S-1 knows that Thompson has a girlfriend, who S-1 identified as "Ki-Ki" and the mother of Thompson's child,

that lives in the pit, the area to include the 4200 and 4300 blocks of Fourth Street, Southeast, D.C.

115.    A criminal history check for Damien Thompson revealed that on January 5, 2006, he was convicted of attempted possession with the intent to distribute cocaine (a felony) in the District of Columbia and on May 21, 2001, his possession of a controlled substance case in Hyattsville, Maryland, received the STET docket.  The STET docket in Maryland is a court procedure whereby a defendant can have his case dismissed or his arrest cleared from his record if he does not get another arrest or conviction within one year.

116.    During the previously mentioned wiretaps, intercepted communications also associate DAMIEN THOMPSON with drug trafficking.  These intercepted communications include:

117.    <u>Activation # 7240</u>

On February 28, 2006, at approximately 11:22 a.m., WILLIE BEST made an outgoing call to JAMES BECTON. During this call, BECTON told BEST he was just about to leave to take a urine test.  BEST told BECTON that this little n---- was calling him 100,000 times like a [mf] ." BECTON told BEST that's what [mf's] do, unless you be playing quarterback, then you cannot hardly find them." BEST asked BECTON if "she" (referring to a quantity of cocaine) is talking about going out today." BECTON told BEST he was waiting on DAMIEN and them to come in, and BEST told him that "she" said they would be coming in today.

Investigators believe that during this call James Becton and Willie Best discussed narcotics trafficking and at one point Becton, one of the leaders of the drug trafficking organization, told Best that he was waiting for Damien Thompson, one of the street-level drug distributors, and others to come and meet him to bring him (Becton) drugs or get a supply of drugs from Becton for resale. Becton and his drug network primarily sell drugs in the 4200 and 4300 blocks of Fourth Street,

Southeast, D.C.

118.   Activation #10534

On March 15, 2006, at approximately 7:27 p.m., WILLIE BEST received an incoming call from DAMIEN  THOMPSON. During this call, BEST asked DAMIEN  where he was, and he said he was in front of "Unk's house." BEST told DAMIEN  that he needed him to run up the street real quick.

Investigators believe that during this call Best, a leader of the drug trafficking network, told Thompson that he wanted him to retrieve or sell drugs for him up the street.

119.   Activations #11462 & 11468

On March 20, 2006, at 7:42 p.m., WILLIE BEST made an outgoing call to telephone number (***) ***-****.  During this call, BEST told his wife, TRACY BEST, that DAMIEN owed him a "couple of dollars" and that he would get in touch with him to get money to give to her.

On March 20, 2006, at approximately 8:11 p.m., WILLIE BEST made an outgoing call to telephone number (***) ***-****.  During this call, BEST told his wife, TRACEY BEST, that he was waiting on DAMIEN  to call him back to get her some money.

Investigators believe that during these calls Willie Best told his wife that he would get money from Damien Thompson from her and Thompson, as a street-level drug distributor, would have cash on hand to deliver to or for Best.

120.   Activation #11470

On March 20, 2006,  at approximately 8:14 p.m., WILLIE BEST made an outgoing call to telephone number (***) ***-****.  During this call, he told his wife, TRACY BEST, that he "was standing down here in the road, trying to keep reception."  TRACY BEST said, "oh, you do not have

reception when you go back to where you do, you know what I am saying." BEST told his wife to

hold on, and then called DAMIEN THOMPSON while she was on the line. At that point, BEST told

THOMPSON that he had been calling his phone 100 times. He also told THOMPSON he was trying

to get that money for TRACY, and THOMPSON told him, "it's cool, come through." Later, BEST

told THOMPSON that he did not want his wife around there on Fourth Street and advised

THOMPSON to give the money to "Country" [DANIEL BECTON], and that TRACY would come

through in the morning to pick it up.

  Investigators believe that during this call Thompson informed Best that he had cash for him

to give to his wife and Best informed Thompson that he did not want his wife coming to Fourth

Street for the cash. The 4200 and 4300 blocks of Fourth Street, Southeast, are areas with a high

incidence of narcotics activity and areas that James Becton and street-level drug distributors stash

and sell narcotics. Thompson, whose girlfriend Lakesha Grimes lived in Apartment # *** at ****

Fourth Street, SE, D.C., sold drugs on Fourth Street and, as such, investigators believe he would

likely store drugs or maintain records at a residence, such as Grimes' residence, on Fourth Street of

which he would have access or dominion and control.

  121. Based on all of the above, your affiant submits there is probable cause to believe that

evidence and instrumentalities of the crimes described above are contained/secreted in **** Fourth

Street, SE, Apartment ***, Washington, D.C.

  **H.**  **<u>**** Second Street, S.E., Apartment *, Washington, D.C.</u>**

   1. <u>Description of the Premises</u>

  122. The search site is located in the Royal Courts Apartments. It is described as a multi-

family, two-story dwelling with multi-colored vinyl siding (light green, tan and pink). The building

is trimmed in white, the lower level is brick, and the top has vinyl siding. The numbers "****" are affixed to the front of the building on Second Street. Apartment * is located on the second level of the building and the second level is accessible by wood steps with a green metal railing and white support columns. Apartment * is also located in the far left corner of the second level and it has a red door. The numbers "****" are positioned on the apartment's door under the peephole and the letter "*" is affixed above the peephole for the apartment door.

2.     Connection of Willie Latrell Best to Address

123.     A review of the records of AutoTrack database reflect that WILLIE J. BEST is the lease holder and occupant of **** Second Street, S.E., Apartment *, Washington, D.C. with a telephone number of (***) ***-****. Moreover, a May 16, 2006, Lexis-Nexis database check for Willie James Best indicates his current address is **** Second Street, S.E., Apartment *, Washington, D.C.

124.     The affiant's investigation revealed that WILLIE J. BEST, also known as "Teeny Man," is WILLIE LATRELL BEST's father.

125.     Between January 27, 2006, and March 27, 2006, law enforcement personnel conducted extensive surveillance on Willie Latrell Best and other members of his conspiracy and during this time period agents or officers observed Best at or outside his father's Second Street residence on at least three different occasions, the last observation of which occurred in February 2006.

126.     Moreover, the affiant's investigation revealed that between January 27, 2006, and March 27, 2006 – the time period the government intercepted communications to and from Willie Latrell Best's cellular telephone (***) *** -**** – Best was estranged or separated from his wife,

65

Tracey Patten Best, who lived at ****-* Haras Place, Fort Washington, Maryland, while Willie Best lived at his father's residence at **** Second Street, SE, Apartment *, Washington, D.C.  Several communications which establish Willie Latrell Best's connection to the residence include:

127.    Activation #135

128.    On January 27, 2006, at approximately 5:58 p.m., WILLIE LATRELL BEST received a call from TRACEY BEST. During this call, BEST, among other things, told TRACEY BEST that he was going to be in "southeast" at his "father's house," and that she could come through as soon as they come in.

129.    Investigators believe that during this call Best informed his wife that he would be at his father's house, which is located at **** Second Street, SE, Apartment *, Washington, D.C.

130.    Activation #1564

131.    On February 1, 2006, at approximately 9:40 a.m., JAMES BECTON called WILLIE LATRELL BEST. BECTON told BEST he was at his house, and for BEST to come on through. BEST also told BECTON he needed a ride, BECTON asked him where he was at, and he informed BECTON he was at Teeny Man's house. BECTON told BEST he would call him when he came out. Your affiant knows, based upon this investigation and base upon discussions between investigating agents and S-2, that "Teeny Man" is a nickname for "Willie J. Best" who lives at **** Second Street, S.E., Apartment *, Washington, D.C.

132.    Activation #1664

133.    On February 1, 2006, at approximately 6:03 p.m.,  CAROLYN BECTON called WILLIE LATRELL BEST who told her he was on Teeny Man's line.  CAROLYN BECTON told BEST to tell Teeny Man to call her when BEST got off his phone.

134.    Investigators believe that during this call Best told Becton that he was talking on another telephone phone line, that is, his father's telephone at the Second Street, Southeast, residence.

135.    <u>Activation #2394</u>

136.    On February 24, 2006, at 3:51 p.m.,  FRED MERCER called WILLIE LATRELL BEST and wanted to know where BEST was at. BEST told MERCER, "I just told you, I am at my father's house." MERCER told BEST he was about to pull up in five minutes.

137.    Investigators believe that this call further demonstrates that Best maintains residence at his father's home on Second Street, Southeast.

138.    <u>Activation # 2987</u>

139.    On February 7, 2006, at approximately 2:11 a.m., WILLIE LATRELL BEST received a call from TRACEY BEST. During this call, TRACEY BEST asked WILLIE about some keys that he had and said that they were not the same keys he once had to his father's house.  BEST then told her  that he had lost those keys and that his father had to give him a new set.

140.    Investigators believe that this call further demonstrates Willie Latrell Best's connection to the Second Street, Southeast, residence.

3.    <u>Probable Cause as to Willie Latrell Best</u>

141.    Willie Latrell Best, like his brother James Becton, are leaders of a drug trafficking network that distributes drugs, to include cocaine, in the 4200 and 4300 blocks of Fourth Street, Southeast, D.C.  Moreover, based upon several intercepted conversations, your affiant believes that BEST resided at, lives at, or maintains regular contact with the Second Street, SE, address and, as such, he – as a drug trafficker – stored or maintained records at the Second Street residence.  In

ddition to previously identified intercepted communications, these conversations include:

142.    Activation #2468

On February 24, 2006, at approximately 7:43 p.m., WILLIE LATRELL BEST received a telephone call from telephone number (***) ***-****. During this call, an individual who identified himself as REGGIE called BEST and asked him for directions to where he [BEST] was at. REGGIE also told BEST he was "by Chesapeake" and BEST told him to come down Fourth Street SE to Mississippi Avenue, SE. BEST then told him to "come down to the next light and make another left, then right on Second" and that he [BEST] was right there on the corner.

Investigators believe that during this call Best provided a customer the directions to his residence so he could sell the customer a quantity of illegal narcotics. Furthermore, this conversation is significant because the Royal Court Apartments are located at the corner of Second Street, and Mississippi Avenue, SE., **** Second Street, S.E., Apartment *, is located in the complex, and Best gave Reggie, a customer, directions to this location.

143.    Activation #3507

On February 9, 2006, at 6:20 p.m., SHANIKA BECTON  attempted to relay  (three way) a conversation between her two brothers, SHAWN BEST and WILLIE BEST. During this call,  BEST told his brother to call him tomorrow on Teeny Man's phone. Through SHANIKA, SHAWN told BEST that he could not call BEST at Teeny Man's house tomorrow since he did not have enough money left on his phone.

Investigators believe that Best's request that Shawn Best call him at his father's home (Teeney Man's home) further establishes Best's relationship to, or connection with, the Second Street residence and, as such, the likelihood he would maintain drugs or documents related to drug

trafficking there.

144.    Activation #7340

On February 28, 2006, at approximately 5:30 p.m., WILLIE BEST received a call from telephone number (***) ***-****. This number is subscribed to by THERESA LONG, ***** Idaho Place, Upper Marlboro, Maryland, 20774.   During this call a person believed to be THERESA LONG told BEST she "was on Mississippi" and he told her to "come down Second Street [and] make the right and come to ****."

Investigators believe that during this call Best intends to meet a customer and provide her with illegal narcotics.  This call is also significant because it connects the Second Street residence to Willie Latrell Best.

145.    Activation # 7344

On February 28, 2006, at approximately, 5:36 p.m., WILLIE BEST received another call from LONG, who asked BEST what door was the apartment.  During this call, BEST told LONG it was a red door.

Investigators believe this call was significant since it identified the exact apartment that BEST was referring to.

146.    Activation #14820

On January 13, 2006, at approximately 1:22 p.m., FRED MERCER called WILLIE BEST. During this call, BEST told MERCER he had been trying to call him all night, and MERCER said he was at Tony's joint. BEST wanted to know how long MERCER was going to be at that location, and MERCER said not too long. BEST told MERCER he was at his father's house. MERCER asked BEST if his father was at home, and BEST told him no. BEST then told MERCER that he was

"fucked up" since his one year old son Gavin had eaten a "piece of cookie" last night. BEST told MERCER "hear what I am telling you...he ate a piece of a cookie last night." MERCER told BEST, "I hear you, but I hope I am not hearing you." BEST told MERCER to come on through.

Investigators believe that during this call BEST told MERCER that his son had eaten some crack cocaine and he [BEST] was upset about it. This call is also significant because it demonstrates that BEST had stored and distributed crack cocaine from his father's address and his young son got some of it.

147.    Based on all of the above, your affiant submits there is probable cause to believe that evidence and instrumentalities of the crimes described above are contained/secreted in the residence at **** Second Street, SE, Apartment C, Washington, D.C.

## V.    Request for No-Knock Authority

148.    Information provided by S-2 also indicates that BECTON has ordered the armed robberies of others.  As discussed above, there were several intercepted conversations in which BECTON discussed possessing different guns.  In one intercepted conversation, Gina Taylor told her mother that BECTON had a bag full of guns.  Agents conducting surveillance have observed JAMES BECTON and KEITH SAMPLER walking out of SHANNON BEST's apartment at **** Stanton Road, S.E.

149.    During the interception of calls on MERCER's telephone, there were many references to the possession of guns.  At one point, when agents seized MERCER's vehicle, he expressed concern that he may have left a particular gun in the vehicle.  Later calls confirmed that one of MERCER's associates had removed the weapon before the vehicle was seized.

150.    In one of the intercepted conversations, CAROLYN BECTON said that her youngest

son (Khadar Becton) had acquired a gun to retaliate against a group of individuals that had assaulted him. Khadar Becton lived with CAROLYN BECTON at **** Wahler Place, S.E. before he was shot and murdered.

151.    S-6 has also advised investigating agents that it had provided a gun to BEST at BEST's request.

152.    As discussed above, many of the intercepted calls concerns different weapons possessed and used by these co-conspirators.  Your affiant also knows that the 4200 and 4300 blocks of Fourth Street, S.E., Washington, D.C. (where this organization conducts part of its drug business) have a history of violent crimes and these co-conspirators have a reputation for violence.  Your affiant know that drug customers that have come to the courts in these blocks have been robbed at gun point and some have even been killed.

153.    Given the long history of this drug organuization, any hesitation or delay in entering the premises will result in a the loss of any drug evidence that may be on the premises to be searched and and will give individuals inside the premises an opportunity arm themselves.

154.    Given these facts, your affiant believes that there is a reasonable suspicion to enter these premises without first knocking.

## VI.    **CONCLUSION**

Based on all of the above, your affiant submits that there is probable cause to believe that evidence and instrumentalities of the crimes described above are contained/secreted in the locations as described and set forth above.

_____

Christopher Fiorito
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this _____ day of May, 2006 in
the District of Columbia.


_____
Honorable Alan Kay
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A

a.  Books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, purchase, packaging, sale and distribution of controlled substances.

b.  Address and telephone books, and papers reflecting names, addresses, and/or telephone numbers.

c.  Books, records, receipts, bank statements, and records, money drafts, letters of credit, money orders and cashier checks, passbooks, bank checks and any other items evidencing the obtaining, secreting, transfer, and concealment of assets and expenditure of money.

d.  Any and all electronic data processing and storage devices or other electronic equipment, such as computers, computer systems, keyboards, central prrocessing units, external and/or internal drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system dcumentation, operating logs and documentation, software and instruction manuals, passwords, test keys, and encryption codes or similar codes that are necessary to access computer programs, facsimile machines, telephone answering machines, telephone paging devices, caller identification, organizers, currency counting machines, and any other information stored in memory or contained in any related hardware and software.

e.  Photographs, in particular, photographs of co-conspirators, assets, or controlled substances, and other documents identifying associates and co-conspirators.

f.  Indicia of occupancy, residency, and ownership of the premises, including but not limited to, utility and telephone bills, correspondence, and keys.

g.  Any locked or closed containers which could contain any of the above listed evidence.

h. Any evidence of participation in narcotics conspiracy.

i. Any evidence related to possession of weapons and/or firearms, including but not limited to revolvers, semi-automatic pistols, rifles, and ammunition.

j. United States currency, precious metals, jewelery and financial instruments, stocks and bonds.

k. Cellular telephones, pagers and records and receipts reflecting their ownership and use.

l.  Safes, both combination and key type, and their contents.